# Staunton.

COMMERCIAL BANK OF LYNCHBURG V. MILLER AND OTHERS.

SEPTEMBER 22, 1898.

Absent, Harrison, J.

1. PARTNERSHIP—*What Constitutes.*—An agreement between two or more persons or firms to do a "joint account" business in a certain line of trade, to which business the parties are to contribute their time, labor, and capital, and to share equally the profits and losses of the business, constitutes the parties to such agreement partners in said business-regardless of what their intentions were.

2. PARTNERSHIP—*Liability on Partnership Paper.*—When a partner of a trading partnership borrows money professedly for the firm, and executes therefor a negotiable instrument in the partnership name, it binds all the partners, whether the borrowing were really for the firm or not, or whether he diverts or misapplies the funds or not, provided the lender is not a party to the intended fraud; and the burden is not on the lender to prove value, or lack of knowledge of the fraud.

3. PARTNERSHIP—*Dormant Partner—Two Firms with same Name.*—If an active partnership contains a dormant partner in one branch of its business, and the business of both is done in the name of the active firm, the dormant partner is not liable for a note made in the firm name where it appears that the active partners were alone dealt with, that credit was extended to them, that they were acting for them, selves only, that the branch of the business in which the dormant partner was interested received no benefit from the credit, and that the dormant partner was not known or represented to be a member of the firm obtaining the credit.

4. PARTNERSHIP—*Liability of a Dormant Partner in a Branch of the Business.*—Where a bank has extended a line of credit for a number of years to a firm, and thereafter the firm takes in a dormant partner in a limited branch of its business, and the line of credit is continued in the firm name, for about the same amount, during the time the dor-

mant partner is interested as aforesaid, and afterwards, the dormant partner will not be held liable for the credit extended to the firm while he was a member, in the absence of evidence that he was known or represented to be a partner, or that the branch of the business in which he was interested got the benefit of the credit extended.

5. PARTNERSHIP—*Dormant Partner—Liability for Debts Contracted after his Retirement.*—A dormant partner is not liable for the debts of the firm contracted after his retirement.

Appeal from a decree of the Circuit Court of the city of Lynchburg pronounced December 6, 1895, in a suit in chancery wherein the appellant was the complainant, and the appellees were the defendants.

*Affirmed.*

It appears from the evidence that T. P. Jose & Sons retired from the "joint account" arrangement with Miller & Hawkins in May, 1891, and that the notes in suit originated in December, 1891, January, 1892, and September, 1892, respectively, and cannot be traced further back than those dates. The residue of the evidence sufficiently appears in the opinion of the court.

*Caskie & Coleman, Jno. W. Daniel,* and *J. E. Edmunds,* for the appellant.

*R. G. H. Kean, Harrison & Long, Thos. N. Carter,* and *A. W. Nowlin,* for the appellees.

CARDWELL, J., delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of the city of Lynchburg dismissing the bill of appellant, the Commercial Bank of Lynchburg, filed to enforce, by way of foreign attachment, the collection of a debt amounting to $7,000 and interest, alleged to be due and owing to the bank by R. L. Miller, T. B. Hawkins, William Wilberforce Jose, John Ed-

mund Jose, and Thomas P. H. Jose, as partners in the leaf tobacco business, and trading under the firm style of Miller & Hawkins, the attachment having been levied upon a debt, amounting to about $12,000, due to the Joses, under the style and firm of T. P. Jose & Sons, by Miller & Hawkins, which debt is secured by deed of trust to Thomas N. Carter, trustee, upon certain real estate in the city of Lynchburg—the Joses being non-residents of the State of Virginia, and residing in Great Britain.

It appears that on the 24th of December, 1887, an agreement was entered into between the Joses, doing business under the style and firm name of T. P. Jose & Sons, of the one part, and R. L. Miller and T. B. Hawkins, doing business as Miller & Hawkins, of the other part, for the purpose of doing what the parties to the agreement denominated "a joint account business together in the purchase, preparation, and sale of tobacco, and all usual trade operations connected therewith, for a term of five years from the 1st of January, 1888, determinable as mentioned in article 10" of the agreement. The other features of the agreement are as follows:

(2.) The costs and expenses of the business were to be borne in equal shares, and the profits or losses equally divided.

(3.) Miller & Hawkins (at Lynchburg) were to buy, free of commission, prepare and ship to T. P. Jose & Sons, at their Bristol house, in England, bright Virginia leaf, or such other classes of tobacco as T. P. Jose & Sons should prescribe; quantities, prices, grades, and styles to be as T. P. Jose & Sons should direct; paying all charges and insurance until f. o. b. the cars at Lynchburg, and consign the same by through bill of lading to T. P. Jose & Sons, at Bristol.

(4.) T. P. Jose & Sons were to sell free of commissions and brokerage the tobacco so shipped to Bristol, to pay insurance, inland and marine, freight, landing, warehouse and selling charges, and render accounts—such payments to be charged to their "joint account, and the sales credited to the same."

(5.) When through bills of lading were sent to T. P. Jose & Sons, Miller & Hawkins were at liberty to draw against the shipment at 60 days for not exceeding eighty *per cent.* of the cost of the tobacco, and expenses and charges accrued and paid by Miller & Hawkins, up to the time the tobaccos were put f. o. b. the cars at Lynchburg.

(6.) T. P. Jose & Sons were to have interest, at five *per cent.*, on the amount of such drafts from their payment.

(7.) Miller & Hawkins were not to ship (with an exception in favor of other firms with which Miller & Hawkins were interested) any tobacco to any merchant in Great Britian or England, except at Edinburg, Glasgow, or London—and all shipments to T. P. Jose & Sons, at Liverpool, were to be for sale by the latter on commission, and not on "joint account."

(8.) Miller & Hawkins were to forward to T. P. Jose & Sons, as early as possible in every season, samples of all such grades and styles of tobacco as T. P. Jose & Sons might require or direct, and keep them as well posted as possible as to crops, prospects, prices, and other things relating to the business, and in all respects conduct this "joint account" business with due regard to the advice, suggestions, and interests of T. P. Jose & Sons.

(9.) The "joint account" brands were to be joint property, and Miller & Hawkins were to take care to brand all tobacco consigned to persons in Glasgow or London in manner absolutely different from the "joint account" brands.

(10.) Miller & Hawkins were to pay or allow T. P. Jose & Sons two hundred and fifty pounds (sterling) if they from any cause, except death or mental incapacity, failed to continue the agreement during the term of five years from January 1, 1888, unless previously terminated by T. P. Jose & Sons, who should be at liberty to do so at any time by three calender months' previous notice in writing.

T. P. Jose & Sons were extensively engaged in business as tobacco merchants and tobacco brokers, with one of their busi-

ness houses located at Liverpool, and the other at Bristol, England, handling tobaccos for all shippers to them; and Miller & Hawkins were located at Lynchburg, Va., and engaged in buying, preparing, and shipping to the tobacco markets in America, Great Britain, Germany, Australia, and other countries, and had been for a number of years prior to this agreement with T. P. Jose & Sons, and went on with their general business after January 1, 1888, as before, without any change in their firm name, or in their method of dealing with the appellant, the Commercial Bank of Lynchburg; Miller attending to the finances of the firm, while Hawkins superintended the factory or warehouse. They began to make shipments to Bristol under this "joint account" agreement, drawing drafts against their shipments to T. P. Jose & Sons through the Commercial Bank. The first draft drawn against the first shipment on "joint account" was on March 28, 1888, and numerous drafts were thereafter drawn, until May, 1891. In the meanwhile Miller & Hawkins were also shipping to foreign markets, and drawing against other parties than T. P. Jose & Sons, at other points, to a large amount, besides their dealings with other markets in the United States, and all of this business was done through the Commercial Bank of Lynchburg. In the spring of 1891, this "joint account" business at Bristol having become unsatisfactory to T. P. Jose & Sons, T. P. H. Jose, a member of this firm, who was in Lynchburg, Va., in April, and again in May of that year, put an end to it, Miller acquiescing in its termination at that time, though no notice in writing of its termination had been given as stipulated in the 10th article of the agreement of December 24, 1887. An effort was afterwards made by Miller to renew the arrangement with T. P. Jose & Sons, but it was never assented to by the latter.

It further appears that all invoices on this "joint account" were so expressed on their face, and the last one sent was dated April 29, 1891; and all subsequent shipments to Bristol,

as well as to Liverpool, to T. P. Jose & Sons were "for and on account of the undersigned," that is, Miller & Hawkins, until this firm was dissolved, and then on account of R. L. Miller or R. L. Miller & Co., on commission.

In August, 1892, the firm of Miller & Hawkins was dissolved, and notice of its dissolution given in a newspaper published in Lynchburg; Miller buying out all interest of Hawkins in the business, assuming the debts of the firm, and thereafter conducting the tobacco business alone, for a while as R. L. Miller, and afterwards as R. L. Miller & Co., until he failed in 1894, and left the State.

When the "joint account" business was finally closed out, there was a small balance of profit resulting from it to Miller & Hawkins, which was transferred to Miller's account with T. P. Jose & Sons at the Liverpool house; and the general account between Miller & Hawkins and R. L. Miller & Co. with the Liverpool house, involving shipments for sale on commission only, after 1891, resulted in large losses.

Miller & Hawkins had, in 1889, in order to get a line of credit with T. P. Jose & Sons for advances, conveyed to T. N. Carter, trustee, their lot and factory in Lynchburg to secure such advances up to $12,000, and as of October 1, 1895, they owed T. P. Jose & Sons over $13,000, secured in part by this deed of trust; and it is this debt due to T. P. Jose & Sons that the appellant seeks to subject in this suit to the payment of its notes alleged to have been contracted by T. P. Jose & Sons and Miller & Hawkins, as partners in the leaf tobacco business at Lynchburg, Va., under the firm name of Miller & Hawkins.

Appellant's original bill, filed November 27, 1894, alleged that it was a creditor of R. L. Miller and the Joses, partners in business under the style and firm name of R. L. Miller & Co., to the amount of $7,002.16, with interest, evidenced by four notes drawn by R. L. Miller, by the style of R. L. Miller & Co., and endorsed by H. J. Hatcher, by the style of H. J. Hatcher & Co.; one dated July 24, 1894, for $1,500; one,

August 4, 1894, for $3,000; one, August 18, 1894, for $1,000; and the other, August 22, 1894, for $1,500; charged that the Joses were partners of R. L. Miller under the style and firm name of R. L. Miller & Co., and attached the debt due by R. L. Miller & Co. to the Joses, secured by the deed of trust to T. N. Carter; the agreement between Miller & Hawkins and the Joses of December 24, 1887, being exhibited with the bill.

T. P. Jose & Sons promptly answered this bill, denying any sort of indebtedness to appellant, or that they had any sort of connection with its transactions with Miller & Hawkins, or R. L. Miller, under that or any other style. They admitted the "joint account" transactions with Miller & Hawkins, at their Bristol house, from January 1, 1888, to May, 1891, when those shipments ceased, and deny the general partnership charged, or that they ever had even a "joint account" with R. L. Miller, or R. L. Miller & Co. Appellant then amended its bill, alleging that the notes issued and made by R. L. Miller & Co. in July and August, 1894, represented indebtedness which arose before Hawkins retired from the firm of Miller & Hawkins, and while the "joint account" arrangement and the alleged partnership with the Joses subsisted; and denying that the "joint account" shipments ceased in 1891. To the amended bill, T. P. Jose & Sons made answer, relying on their answer to the original bill, and putting the whole of appellant's case in issue. R. L. Miller made answer to the original and amended bill, setting forth that the nature of his contract relations with T. P. Jose & Sons was fully set out in the agreement of December, 1887; that the history of these relations was correctly set forth in the answer of T. P. Jose & Sons; that the statement of the original or amended bill that the notes therein referred to of R. L. Miller & Co., given in renewal of the notes of Miller & Hawkins, were discounted and renewed from time to time upon the credit of T. P. Jose & Sons, and because it was represented to the directors and

officers of the plaintiff bank that T. P. Jose & Sons were members of the co-partnership of Miller & Hawkins, was not true; denying that respondent ever at any time, either as a member of the firm of Miller & Hawkins, or when conducting business as R. L. Miller & Co., used his connection with T. P. Jose & Sons as a basis of credit, except that the existence of a "joint account" business was known to the bank, and alleging that when the notes in suit were originally made and discounted by respondent at the appellant bank, he was possessed of ample means, and his own credit was a sufficient guaranty of all paper discounted by him at the bank, and that when his financial condition changed, the bank looked to his property, and relied for security upon encumbrances thereon which he gave, at the bank's request, embracing nearly his entire estate.

Upon the hearing of the cause, upon the original and amended bills, the answers thereto and the exhibits with the bills and answers, and depositions of witnesses for complainant and respondents, the Circuit Court dismissed the bills.

Whatever may have been the intentions of the parties thereto, the agreement of December 24, 1887, made and constituted the persons composing the firm of Miller & Hawkins, and those composing the firm of T. P. Jose & Sons, partners in the business of buying, preparing, and shipping bright Virginia leaf tobacco and such other classes of tobacco as were contemplated by the agreement, to the Bristol house of T. P. Jose & Sons for sale on the "joint account" of Miller & Hawkins and T. P. Jose & Sons, and to conduct all usual trade operations connected therewith, the partnership to continue for five years from January 1, 1888, till terminated by limitation, or as provided for in the agreement or by mutual consent of the partners. *Winship* v. *Bank of U. S.*, 5 Peters 560; *Weaver* v. *Tapscott*, 9 Leigh 424; *Bank* v. *Washington*, 8 Gratt. 248; and *Jones* v. *Murphy*, 93 Va. 218.

It does not follow, however, that the debts sued on here are debts properly chargeable to this partnership, whether con-

tracted by R. L. Miller, or by R. L. Miller as R. L. Miller & Co., or by Miller & Hawkins. The question remains whether or not these debts were contracted on the faith and credit of the Joses as partners with Miller & Hawkins, or whether the money was loaned for the benefit of the partnership, or the partnership received the ·benefit of the loans. If they were ever the partnership debts they remain so, of course, till paid, whether evidenced by the original notes given for the loans or notes given in renewal of notes formerly evidencing such loans.

It is settled law that " the borrowing of money and negotiation of bills and notes being incident to, and usual in, the business of co-partnerships formed for the purpose of trade, it follows that when a co-partner borrows money professedly for the firm, and executes therefor a negotiable instrument in the co-partnership name, it will bind all the partners, whether the borrowing were really for the firm or not, or whether he diverts and misapplies the funds or not, provided the lender is not himself cognizant of the intended fraud, and the burden will not be thrown on him to show that he was not cognizant of such fraud, or to prove value given for the paper." Daniel on Negotiable Insts., sec. 357. But the question in this case still is, did Miller & Hawkins or R. L. Miller, or the latter trading as R. L. Miller & Co., after Hawkins' retirement from the firm of Miller & Hawkins, borrow of the appellant bank the money, evidenced by the notes in suit, professedly for the firm in which the Joses were partners?

The learned author of Lindley on Partnership, Vol. 1, Book 11, sec. 5, p. 177, in discussing the liability of partners in respect of contracts not entered into on behalf of the firm, or not so in proper form, says: " The general proposition that a partnership is bound by those acts of its agents which are within the scope of their authority, in the sense explained in the foregoing pages, must be taken with the qualification that the agent whose acts are sought to be imputed to the firm *was acting in his character as agent,* and not as a principal. If he did

not act in his character of agent, if he acted as a private indi-
vidual on his own account, his acts cannot be imputed to the
firm, and he alone is liable for them, even though the firm
may have been benefitted by them. Whether a contract is
entered into by an agent as such or by him as a principal, is
often, but not always, apparent from the form of the contract."

In the case of *Beckham* v. *Drake*, 9 M. & W. 79, where the
question was discussed whether a dormant partner was bound,
though his name did not appear, by a contract made on behalf
of the firm of which he was a member, in the firm name, the
court, although holding the dormant partner in that case lia-
ble, fully recognized the established doctrine that if one part-
ner only is dealt with, and the circumstances are such as to
show that he was acting and was dealt with on his own account,
*i. e.*, as a principal, and not as the agent of the firm, *he alone is
responsible.*

Leaving out of consideration the answer of R. L. Miller in
this case, we come to the consideration of the circumstances
under which the debts asserted herein were contracted, and
the facts shown by appellant upon which it relies to charge T.
P. Jose & Sons with their payment.

In addition to the circumstances already stated as surround-
ing the transactions of R. L. Miller, the acting member of the
firm of Miller & Hawkins, and attending exclusively to the
finances of the firm with the appellant bank from January 1,
1888, to the spring of 1891, when the agreement of December
24, 1887, was set aside and annulled by the acquiescence of
Miller, it is shown that from 1882 or 1883, Miller & Hawkins
had enjoyed with this bank a line of accommodation credit or
discounts of $9,000 to $10,000 *per annum*, and this continued
to the dissolution of the firm of Miller & Hawkins, in August,
1892, and to R. L. Miller thereafter. On January 1, 1888, the
firm owed the bank $9,500 of such accommodation loans; on
December 1, 1891, $11,513.75; and on June 1, 1892 (shortly
before Hawkins went out of the firm), $10,400. There was no

publication of the agreement with the Joses of December 24, 1887, it being understood, as it appears, among the parties thereto, that it was not to be made known, and there is no sufficient proof that the Joses were held out by either Miller or Hawkins, or any one else in Lynchburg, Va., or elsewhere, as partners in the business of Miller & Hawkins, whereby the appellant could have been induced to contract with Miller & Hawkins or R. L. Miller on the faith and credit of the Joses as their or his partners at the time of or prior to the contracting of the debts evidenced by the notes in suit. The principal evidence relating to the period from January 1, 1888, to the inception of these debts, is given by Hawkins, who, in speaking as a witness for the bank of the interest of the Joses in the business done with the bank, under the name of Miller & Hawkins, says: "We kept it (agreement of December 24, 1887,) no secret. I suppose the bank knew it, and reckon it was known all over town." This is entirely too vague and indefinite, especially in view of the fact that other witnesses who were connected with the bank not only fail to corroborate Hawkins, but show that at the time of which he speaks the bank had no knowledge of any connection of the Joses with the business of Miller & Hawkins. The notes in suit, as shown by witness Withers, teller of the bank at the time of the transactions, examined as a witness on its behalf, arose as follows: two of them for $1,500 each December 1, 1891, made by Miller & Hawkins, and endorsed by H. J. Hatcher & Co., months after the agreement of December 24, 1887, had been annulled with the assent of Miller, the active member of the firm of Miller & Hawkins, and eight months after, as we have seen, the last shipment under the agreement had been made to Bristol on "joint account," and drawn on by Miller, through the bank. The remaining two notes originated, one in January, and the other in September, 1892, the first made by Miller & Hawkins, endorsed by H. J. Hatcher & Co., and the last by R. L. Miller, endorsed by H. J. Hatcher & Co. after Hawkins had

retired.    The notes made in the name of Miller & Hawkins. were renewed one or more times in that name, and then one or more times in the name of R. L. Miller, and, finally, in the name of R. L. Miller & Co.

Kinnier, who was cashier of the Commercial Bank (appellant) from 1882, when organized, to January 1, 1895, first said, when examined as a witness in this case, that he never saw a contract between Miller & Hawkins and Jose & Sons, but that he did see one between R. L. Miller & Co. and Jose & Sons, but could not remember when, while in fact the only contract that ever existed was that of December 24, 1887.    When shown the contract, he said it was with Miller & Hawkins, and that, before producing the contract, Miller, on several occasions, had told him "he was buying tobacco on joint account," or, in other words, "he was shipping tobacco to the Joses and dividing profits," but witness said he was unable to give the dates, though it was before a meeting of the finance committee of the bank called in September, 1893, to inquire into the affairs of Miller, at which meeting the contract was produced.    In addition to the vagueness of this witness' testimony, and his total inability to fix even approximately the date when these conversations were had with Miller, he is plainly shown by Edmunds, the attorney for the bank and its witness, to be in error by more than a year as to the time when the contract was produced by Miller.    Edmunds, who was present at the meeting in September, 1893, when a year's extension was given Miller on this indebtedness, says that the contract was not produced by Miller on that occasion, and was not produced till November, 1894—not long before this suit was brought.    He further says that he was requested to meet the finance committee in September, 1893, to learn what arrangement Miller could make for the payment of *his* indebtedness to the bank; that Miller, at this meeting, desired an extension of *his* indebtedness for a period of one year, and said, if given him, that he would give the bank security on some real estate he had, and that the bank should fear no harm about the in-

debtedness, for if the security he offered should be of no value, and he himself had nothing, his partners, the Joses of England, were very wealthy men, and could meet the indebtedness without feeling it; that the Joses were his partners, and equally bound with him for the debt.   Witness then says that "upon that statement of Miller's, and also the additional security given, we gave him the extension requested of one year, dating it from September 23, 1893."

This is the only positive statement we have from any of the witnesses, the other witnesses being even less definite than Kinnier, as to the time when Miller represented to the bank or any one connected with it, that the Joses were partners with Miller & Hawkins and bound for this indebtedness, and it would seem incredible that the bank would have permitted the renewal of these notes from their origin in December, 1891, and in January and September, 1892, first in the name of Miller & Hawkins, then R. L. Miller, and afterwards R. L. Miller & Co., till September, 1893, when they were extended one year, at a meeting called expressly to learn what Miller could do about his indebtedness to the bank, without a single demand ever being made on the Joses for their payment, or a single intimation to them that they were looked to for the payment of the notes, or any part of them, if in point of fact they were contracted on the faith and credit of the Joses, or the bank had any good reason for supposing that the Joses were interested in the transactions of Miller with it.   A statement by a person that another is his partner in business, which induces the person to whom the statement is made to give credit upon the faith and credit of the person represented to be a partner and bound for the debt, will bind such person, if the statement be true, but not if untrue ; and in the absence of all, certainly of sufficient proof, as is the case here, that it was represented to the appellant at or before the notes in question originated that the Joses were partners with Miller & Hawkins, or R. L. Miller, in the transactions out of which the indebtedness arose,

the contention that the loans were made by appellant on the faith and credit of the Joses wholly fails.

Upon the question whether or not the proceeds of these notes or any of them went into the business conducted by Miller & Hawkins and the Joses under the agreement of December 24, 1887, the only proof is the testimony of Hawkins, who, in answer to the question (objected to as leading): "During the continuance of this business, and while you were a member of the partnership, the negotiable notes signed in the name of Miller & Hawkins were discounted for the partnership, of which the Joses were members, as you have said, at the Commercial Bank of Lynchburg, and if so, state whether or not the proceeds of those notes were used for the purpose of buying tobacco or paying for tobacco which was bought under the articles of partnership and shipped to the Joses at Bristol?" says, "Yes, sir; notes were discounted there at the Commercial Bank. I suppose the proceeds were used in part for that—I cannot say they were used altogether for that purpose"; and, when pressed by a following question, he says: "I could not say that all of them were used for buying tobacco for T. P. Joses & Sons, as we were buying tobacco for other purposes. I have no doubt that some of the proceeds of these notes were used to pay for tobacco shipped to the Joses." When he had stated that Miller & Hawkins had some notes at the Commercial Bank when he retired from the firm, but how many he could not say, and that he thought some of them had been renewed, this witness was asked to state "as nearly as he could what was the amount of the notes of Miller & Hawkins held by the bank at the time of his retirement; was the amount of those notes greater or less than $7,000" (the amount of the notes in suit), to which he replied: "I really do not know how to answer that question, for the simple reason that Mr. Miller attended to everything of that kind, and I attended to everything in the factory, and I do not know how to answer that question. I should not like to say whether it was $3,000, $7,000, or $10,000."

Opinion.

In addition to the fact shown that this witness' memory was so treacherous that he could not tell just when he retired from the firm of Miller & Hawkins, it is also shown by appellant's witnesses that these notes in suit all originated after the "joint account" had been ended, and one of them after Hawkins' retirement in August, 1892. Hawkins was also familiar with the agreement of December, 1887, and therefore knew that, according to its provisions, Miller & Hawkins were to pay all the charges, &c. in buying, preparing, and shipping the tobacco to the Joses " until the delivery free on rail from the factory at Lynchburg, and to consign the same by through bill of lading to the Joses at Bristol," &c.

It is furthermore shown from the books of the appellant that the drafts of Miller & Hawkins on the shipments of tobacco to the Joses at Bristol, during the continuance of this partnership or "joint account" business from January 1, 1888, to April 29, 1891, amounted to only about $60,000, while the drafts drawn by Miller & Hawkins during this period on shipments to other points out of the United States (to say nothing of their business in the United States,) amounted to more than $290,000, or nearly five times as much as the whole "joint account" business during the same period; and though all of these drafts were collected through or discounted at the appellant bank by Miller, for account of Miller & Hawkins, neither during this time nor afterwards, till this suit is brought, does the bank make demand upon or suggest to the Joses that they were looked to for the payment of any indebtedness to it of Miller, or of Miller & Hawkins.

We are of opinion that appellant has failed to show that T. P. Jose & Sons are liable for the debts asserted in its bill. On the contrary, the proof is that the debts were contracted by Miller, acting for himself or Miller & Hawkins, but not as a member of, or agent for, a firm in which T. P. Jose & Sons were partners. Therefore, the decree of the Circuit Court is affirmed.

*Affirmed.*