# CHARLESTON.

## DUFFIELD v. REED *et al.*

Submitted May 13, 1919. Decided May 20, 1919.

1. PARTNERSHIP—*Relation.*

   The voluntary association of two or more persons for the purpose of uniting their means, skill and labor to carry on a legal business, or perform a legitimate work, constitutes them a partnership. (p. 289).

2. SAME—*Expressed or Implied Intention.*

   A partnership, as to the parties thereto, springs from their intention, which need not be expressed in writing, but may be by oral agreement, or may be implied from their conduct and dealings with one another. (p. 289).

3. SAME—*Partnership Agreement—Presumption and Burden of Proof.*

   A partnership being established, the presumption is that the partnership agreement is in accordance with the general rules of partnership law, and casts the burden of proof on that partner who asserts that another partner's interest in the profits of the business is not determinable according to such rules. (p. 289).

4. Same—*New Members—Consent*.

   A new member may be taken into an existing partnership with the consent of all its members. (p. 289).

5. Same—*Secret Contract by One Partner—Validity*.

   One partner cannot make a secret contract with a third person disposing of a portion of the prospective profits of the joint enterprise for his own private benefit, which will bind the partnership. (p. 290).

Appeal from Circuit Court, Kanawha County.

Suit for an accounting by E. E. Duffield against K. E. Reed and others. Decree for plaintiff and defendant Reed appeals.

*Affirmed.*

*A. M. Belcher,* for appellant.
*Linn & Byrne,* for appellee.

Williams, Judge:

Claiming to be a partner with P. T. Board and K. E. Reed in the work of grading twelve miles of railroad in Tyler county for the Tyler Traction Company, a corporation, E. E. Duffield brought this suit for an accounting and for his share of the profits of said work. The circuit court of Kanawha county gave him a decree for $4,288.51, payable out of a fund of $5,000 which had been deposited in the hands of L. V. Koontz by Board and Reed to be held subject to this controversy, and the defendant K. E. Reed has appealed.

The contract for the work was made with the traction company by Board and Reed, Board agreeing to furnish one-half the outfit and money necessary to perform the work, and Reed the other half. Reed associated plaintiff with himself, with Board's consent. The contract with the traction company required a bond of the contractors in the penalty of $15,000 to insure the performance of the work. This bond was signed by P. T. Board, L. V. Koontz and Forsythe Stephenson. The contract further provided that, as the work progressed, 10% of the amount due the contractors was to be retained until the work was completed. Reed contends that

84 W. Va.

the plaintiff was not an equal partner with himself, but was entitled to only one-fourth of the profits less the percentage withheld and that he, Reed, had agreed with Forsythe Stephenson to give him one-fourth of the percentage in consideration of Stephenson's signing the bond as surety and agreeing to lend him such sums of money as he would need to carry on his part of the work. Whether such contract with Stephenson is binding on plaintiff is really the only question in the case. Reed does not pretend that it is binding on Board. He swears he notified plaintiff of his agreement with Stephenson at the time he took him in as a partner in the work. But plaintiff denies this, and swears he never heard of it until after the work had been completed and they had attempted to settle. Board also swears he never heard of it until after the work was finished. Plaintiff and Reed, as equal partners, had just completed a piece of work at Buffalo Creek in Clay county, and were looking for other work when Board learned of the Tyler county job. When he received an invitation to bid on the Tyler county work Board says he first went to see Duffield, that he was out of town and he then went to see Reed, and thinks he told him that he had been to see Duffield, and, his recollection is, that Reed replied they could go ahead and begin the work and, if Duffield wanted an interest in it, he could get it. He also mentioned the same matter to Reed when they went to Sistersville to sign the contract, and Reed then said he could arrange it with Duffield afterwards.

Board, Duffield and Reed were all practical railroad construction men, and while no two of them seem to have been general partners in all their work, Reed and Duffield had been associated as partners at other times on other jobs, one on Loup Creek and later on the Buffalo Creek job which was begun about a year before the Tyler county work was undertaken. The Loup Creek work was not completed when the Buffalo Creek job was undertaken, and Duffield says he and Reed sublet the Buffalo Creek work to himself and Mr. Widen at 10% less than he and Reed were to get for the work, with the understanding that Reed was to remain on the Loup Creek

work and he to take charge of the Buffalo Creek job, and they were to share equally in the profits of both jobs. Before completing the Buffalo Creek work, he says Reed got a job in South Charleston and he advanced him money to start it; that they made some money on this job and shared equally in the profits. Duffield and Reed then bid on the job of grading the car line from Charleston to Dunbar and their bid was accepted. In the meantime Duffield says he had gone to examine a piece of work on the Coal & Coke Railway at Gilmer station, and when he returned to Charleston found a letter from Reed to him advising him not to sign any contract on any work, as he and Board had gone to Sistersville to bid on twelve miles of work, "and if they got it it would be all the work we (meaning himself and Duffield) could handle." On the following day, when Reed and Board returned from Sistersville, Duffield says they all met at the Washington Hotel and talked over the price at which the work had been bid in, and they all thought, while the prices were low, they could make a little money, and that Reed then told him he hadn't put his name in the contract because he didn't have the authority to do so, but said "Mr. Board wanted half of the work and for us (Duffield and Reed) to take the other half." Duffield further says he told Reed that if he didn't want him to go in with him on the Tyler county job he thought he could get the Gilmer station work without opposition, and that Reed replied, they (meaning Duffield and himself) didn't have much outfit and to divide it up between them wouldn't give him anything to put on the work and he woudn't be able to handle the half of it with his part of the outfit, and insisted on his taking a fourth interest in the work at Sistersville. Duffield then went to Clay Court House and got a certified check for $2,000 on the fund from the Buffalo Creek work, and delivered it to Board and Reed to be mailed to the Tyler Traction Company as evidence of their good faith, until the required bond could be given. He also says he was personally on the Tyler county job from its inception to its completion, a period of about fourteen months, except about one week when he was looking for men to work on

the job. Duffield's testimony is sustained by a number of other witnesses. Mr. Board says, just after his and Reed's return from Sistersville, when all three of them met at the hotel, they discussed the matter and all agreed they would be making a fair profit on the job if they could clear the 10% which was to be withheld until its completion, and further says, according to his recollection, that Reed told him Duffield was to have as much interest in the contract as he (Reed) had.

I. C. Trout, the bookkeeper for the firm of Board and Reed for about a month at the beginning of the Tyler county work and before Hill became the bookkeeper, testified that, when the grading tools were shipped to the work, Reed gave him a list of those shipped by Duffield, and told him to take care of the list, "as he and Mr. Duffield were partners in the work." Scott Nottingham, the bookkeeper for Widen and Duffield on the Buffalo Creek work, was called up to Sistersville, he says, to help make a settlement between Duffield and Reed as to the work they had done before undertaking the Tyler county work, and that Reed told him he wanted to know exactly how they stood so that Duffield could put in an amount equal to what he had put in the work, and said Duffield had the same interest in the Tyler county work he (Reed) had, that Duffield was present when this conversation was had; and that the Loup Creek, Buffalo Creek, South Charleston and St. Albans jobs were included in this settlement. F. D. Clemens testified that Reed asked him to come to Tyler county with a view of bidding on some masonry work to be done, that he remarked that he didn't think Mr. Board liked him very well, and would not be disposed to give him any work, and Reed replied "that he and Mr. Duffield had as much interest as Mr. Board had; that Board had one-half interest and he and Duffield a quarter, and said that Mr. Duffield's name was not in the contract, but that he was a partner." Reed does not dispute the testimony of witnesses Trout and Nottingham, and only denies a part of the conversation between himself and Clemens, as related by the

latter. He admits he told Clemens he and Duffield were partners in the work with Board, but denies that he went into details with him respecting their interests, but admits, however, he may have said to witness that Duffield had a one-fourth interest in the outfit. Cluster Chapman, a teamster on the Tyler county work and part of the time stable boss, testified that Reed told him Board had a half interest in the work, Reed one-fourth and Duffield one-fourth. Reed admits telling this witness Duffield had a one-fourth interest in the outfit and Board a one-half, but denies that he ever told him that Duffield had a one-fourth interest in the work.

The evidence decidedly preponderates in favor of Duffield's contention, that he was jointly interested in the profits of the Tyler county work with Board and Reed and was entitled to one-fourth of the profits. There is no controversy as to Board's interest, both Reed and Duffield admit that he was interested to the extent of one-half.

Several months before the Tyler county work was completed Reed went to Jane, Virginia, to take charge of a job undertaken by him and Board, in which Duffield had no interest, and, after the completion of the Tyler county work, Duffield and Hill, the bookkeeper, went to Jane to settle the accounts of Reed and Duffield. Board, Reed and Duffield were all present on that occasion. Hill testified that he kept separate accounts of each member of the firm, that balances were struck between Reed and Duffield, and the former owed the latter a balance of $5,000; that the items embraced in the account were the cash turned in to the firm of Board and Reed by K. E. Reed and by E. E. Duffield, the outfit turned in by Duffield and Reed, the profits on the work, and the division of the outfit between Duffield and Reed, that was taken from the Tyler county work to Board and Reed's work at Jane, Virginia. Hill further says he had kept their accounts, believing Duffeld and Reed were equal partners on the job, and that, after stating the account showing a balance due Duffeld, Reed admitted it was correct so far as he could see; and not until the next day after Duffield had left Jane, did Reed inform the witness that he (Reed), as between himself and Duffield, was to have the entire 10% withheld by the traction company;

that while they were making the settlement Reed made no objections to any of the items charged with two or three exceptions, some, as witness remembers distinctly, being some steam drills, the price of which Reed thought was too much, and the price of these being changed to his satisfaction, witness says, "he agreed to the account." The account then rendered is identified by witness Board and exhibited with his deposition, and shows a balance due Duffield of $5,010.36. Since the ascertainment of that balance it is shown by the written stipulation of counsel, filed in the record, that the stock and equipment of Board and Reed was equitably divided between Board, Reed and Duffield and that, by reason of such division, Duffield should be charged with the sum of $321.85. This sum was deducted from said balance, leaving a revised balance of $4,688.51. From this balance there was deducted the further sum of $400, which was thereafter paid to Duffield, which he admits, thus leaving a balance due him from Reed of $4,288.51, and for which sum the court gave him a decree.

Although the Tyler county contract was taken in the name of Board and Reed, it is proven that Duffield was taken in as an equal partner in the contract with Reed, these two together taking a half interest and Board the other half. Their intention to create such a partnership for the performance of the Tyler county work, and to share in the profits is clearly deducible from the evidence concerning what was done and said by them in relation to the work. A formal writing is not necessary to create a partnership between parties; their voluntary consent was all that was necessary, and that may be either expressed, or implied from their conduct and dealings. *Wm. Dering & Co.* v. *Coberly,* 44 W. Va. 606. "A partnership as between the parties themselves is a voluntary contract between two or more persons for joining together their money, goods, labor or any or all of them under an understanding, that there shall be a communion of profits, between them and for carrying on a legal business." *Setzer* v. *Beale,* 19 W. Va. 274. *McClung* v. *Hughes,* 5 Rand. 459;

*Commercial Bank* v. *Miller,* 96 Va. 357; and 30 Cyc. 360. It was not necessary that Reed and Duffield should have been general partners in all of their undertakings in order to constitute them partners with Board in the Tyler county work. A new partner cannot be let into an existing partnership without the consent of all the partners. But here it is clearly proven, and not denied, that Board consented to Reed's associating Duffield with him to assist him in performing his half of the undertaking, and he was thereby a partner in the performance of that particular work.

Reed does not deny that Duffield was a partner; that he put up one-fourth the outfit and advanced one-fourth the money to carry on the work. But he seeks to qualify and limit his interest in the profits, by claiming a special arrangement between them, whereby he was not to share in a certain per centum thereof. The partnership being admitted, the presumption is that the partnership agreement was in accordance with the general rules of law, whereby each partner would share in the profits and losses according to the proportion of means, skill and labor furnished by him to carry on the joint enterprise. 30 Cyc. 475. This legal presumption casts upon Reed the burden of proving the alleged agreement between himself and Duffield, and this burden he has utterly failed to discharge. On the contrary the evidence preponderates decisively in favor of Duffield. The percentage withheld by the Tyler Traction Company was something over $17,000 and the profits on the work were less than $14,000, wherefore, if Reed's contention is true, Duffield has lost several hundred dollars on the job and his loss would go to swell Reed's profits.

Reed may have made the contract with Stephenson, they both swear to it, but he thereby bound only himself. Board, Duffield and the bookkeeper, Hill, all testify that they never heard of the alleged contract between Stephenson and Reed until after the settlement made at Jane, Virginia, and after Duffield had left there. Board and Duffield both say that,

after the balance due the latter was ascertained, Duffield asked Reed to give him a check for it, and the only objection then made was that it was too much money to pay out without thinking it over; that he would like to think it over for the night or a day or two, and Duffield says, on the next morning Reed said: "Duffield, you have talked about me and I have decided to take 5% off you on the Sistersville work." According to Reed's own contention the contract was not made on the partnership account, but solely on his own. It is, therefore, not binding on the partnership, nor on Duffield individually, because he did not consent to it.

The foregoing conclusions lead to the affirmance of the decree, and it will be so ordered.        *Affirmed.*