# Wytheville.

## COMMONWEALTH OF VIRGINIA AND COUNTY OF ROCK-BRIDGE v. SOUTHEASTERN IRON CORPORATION.

### June 11, 1925.

Argued before Judge Chichester took his seat.

1. TAXATION—*Erroneous Assessments—Capital of Corporation—Community of Interests between Corporations—Assessment against Either—Case at Bar.*—In the instant case, ore and manufactured products therefrom belonging to one corporation was assessed as capital of another corporation. It was contended that the two corporations should be held to be one and the same in the eyes of the law; that there was such a community of interest in the property that an assessment against either or both corporations would be proper. The corporation to whom the property belongs owned sixty per cent of the stock of the corporation to whom the property was assessed, but they had different directors and officers. The contract under which the corporation assessed held the property of the other was a fair business arrangement between the corporations and there was no suggestion of fraud.

   *Held:* That while the principle relied upon was sound, the testimony did not bring the instant case within it.

2. CORPORATIONS—*Disregarding the Separate Corporate Entity of Two Corporations—Two Corporations Regarded as the Same.*—There are instances where the separate corporate entity of two corporations may be disregarded and the corporations held to be one and the same in the eyes of the law. But the cases in which the courts have enforced this rule are either when the corporate entity is used to conceal a fraud, or when a corporation is so organized and controlled as to make it a mere instrumentality of another corporation.

3. TAXATION—*Partnership—Partnership Property—Listed by and Taxed to the Firm.*—Under Code of 1919, section 2307, as amended by Acts 1923, page 120, property belonging to a company or firm should be listed by and taxed to the company or firm and not by or to the individual members of the firm.

4. PARTNERSHIP—*Definition.*—An accurately inclusive and exclusive definition of partnership seems to have eluded the capacity of courts to express.

5. Partnership—*Test of Partnership—Sharing of Profits and Losses.*—The sharing of profits and losses is not a conclusive test of partnership.

6. Partnership—*Test of Partnership—Community of Interest in and Control over the Partnership Property.*—In order to charge parties as partners, it is necessary that they have a community of interest in and control over the partnership property and business.

7. Partnership—*Sharing of Profits—Relationship of Principal and Agent.*—If the parties merely occupy the relation of principal and agent, or employer and employee, no partnership can be predicated upon the fact that such agent or employee receives a share of the profits as compensation for his services or other benefits conferred.

8. Partnership—*Corporations—Compensation Based on Profits—Case at Bar.*—A corporation undertook to manufacture ore for another, its compensation to be a proportion of the profits made by the other corporation. The manufacturing corporation loaned money to the other corporation for the purchase of ore, which the borrowing corporation was required to return with interest. The contract clearly showed that the manufacturing corporation had no ownership in either the ore or the manufactured products.

   *Held:* That as there was no community of interest in or a joint ownership of the property, there was no partnership.

9. Taxation—*Trusts and Trustees—Technical Trustees—Section 2307 of the Code of 1919.*—Section 2307 of the Code of 1919 providing that property held in trust shall be listed by and taxed to the trustee refers to technical trusts and not to those implied from a contract.

10. Taxation—*Trusts and Trustees—Assessment of Property of one Corporation against Another—Cast at Bar.*—In the instant case, the property of one corporation was assessed as the capital of another corporation. It was contended that the corporation assessed was a trustee of the corporation owning the property; and, therefore, under section 2307 of the Code of 1919 the assessment was not erroneous. But there was no assessment against the corporation as trustee, but only against it on its capital alleged to have been employed in its business, and omitted from taxation. If the property could have been assessed against the corporation as trustee, it would appear that it could only be assessed as tangible personal property, and such property carries a rate of taxation different from that imposed on capital employed in business.

11. Trusts and Trustees—*Who are Trustees—Bailee.*—It is perfectly clear that a bailee is not a technical trustee.

12. Taxation—*Capital—Erroneous Assessment—Property of one Corporation Assessed as Capital of Another—Case at Bar.*—In the instant case the S. corporation entered into a contract with the M. corporation, which owned sixty per cent of its stock, to manufacture pig iron for

the account of the M. corporation. The M. corporation to furnish the ore and the S. corporation to ship the manufactured products as ordered by the M. corporation. The S. corporation loaned the M. corporation four hundred thousand dollars, bearing interest, to purchase ore. The compensation of the S. corporation was to be based upon the profits of the M. corporation from the sales of the manufactured products. The S. corporation was assessed upon the ore and manufactured products on hand under the contract at its furnace as part of its capital under section 8 of the tax bill, Acts of 1918, page 171. The assessment was as of omitted capital of the S. corporation and when made the property in question was no longer in the possession of the S. corporation.

*Held:* That this assessment was erroneous.

Error to a judgment of the Circuit Court of Rockbridge county in a proceeding to correct an erroneous assessment. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*A. Willis Robertson, Henry M. Gould,* and *E. Warren Wall,* for the plaintiffs in error.

*Munford, Hunton, Williams & Anderson* and *Wirt P. Marks, Jr.,* for the defendants in error.

Prentis, J., delivered the opinion of the court.

The Commonwealth and the county of Rockbridge are here seeking the reversal of an order entered upon the petition of the Southeastern Iron Corporation, relieving it from certain assessments for taxation upon its capital which it is alleged was illegally omitted for the years 1919 and 1920.

The essential facts may be thus stated: Southeastern Iron Corporation, hereinafter called Southeastern, was incorporated under the laws of Virginia

May 21, 1917, with its principal office in the city of Richmond. It maintained an office in the city of Chicago, Ill., and was authorized to do business there. The Iroquois Iron Company, an Illinois corporation, hereinafter called Iroquois, for many years prior to 1918 had been operating five furnaces at South Chicago, Ill. The Miami Metals Company, an Illinois corporation, hereinafter called Miami, commenced the business of developing the production of domestic ferro-manganese ore in 1915 or 1916. During the World War this company largely acquired control of the domestic ore, and made contracts with Brazilian producers for high grade ferro-manganese ore mined there. Miami owned no furnaces, however, and in 1916 it entered into contract with Iroquois under which that corporation agreed to manufacture ferro-manganese and spiegeleisen from the ore owned and furnished by Miami. As compensation to Iroquois for manufacturing the ore, a fixed proportion of the profits which Miami derived from the operations was agreed upon, and this arrangement continued during 1916 and 1917.

Southeastern was capitalized at $500,000.00, of which capital stock Miami owned about sixty per cent, but none of the other forty per cent of the capital stock of Southeastern was owned by any of the officers or directors of Miami. The board of directors of Miami consisted of three members, while the board of Southeastern consisted of seven. None of the directors of either corporation was a director of the other. Each had a different president and secretary. At one period three directors of Miami were vice-presidents of the Southeastern. Miami did not own any of the capital stock of, and was not financially interested in, Iroquois.

After its organization, Southeastern acquired from furnace property located at Goshen, Rockbridge county,

Virginia, which included a large acreage with a blast furnace and its usual accessories. The early operations of the Southeastern proved unprofitable, but to January 1, 1918, these were conducted solely for its own account. Thereafter it operated under the contracts hereinafter referred to.

It appears that the demand for ferro-manganese was greatly increased during the World War, and the chief sources of production were the mines of Brazil, India and Russia, little being mined in this country prior to that time. It was impossible on account of war conditions to procure high grade ore from India and Russia, and therefore the owners of the Brazilian mines controlled the manganese ore market in this country. As a result of this control and the large demand incident to the war, this Brazilian ore advanced about 600 per cent over the normal pre-war price, and when it became necessary to negotiate contracts for this ore in 1918, the Brazilian producers required contracts for the entire amount needed during the whole year at the then prevailing high price. Southeastern was therefore, in the latter part of 1917, under the necessity either of contracting in advance with Brazilian producers for manganese ore for all of its 1918 requirements at war prices, or of changing its methods. It was anticipated that at the end of the war there would be a sudden decline in the price of this ore, so that in view of the war conditions and the uncertainty as to its continuation, Southeastern was unwilling to hazard its capital in a contract with the Brazilian owners for all of its 1918 requirements.

Miami at that time controlled the domestic ore and had contracts with the Brazilian producers for ore to be delivered in 1918, and Miami desired to have all of its ore, that from the domestic mines as well as that which

it would receive under its Brazilian contracts, manufactured as promptly as possible, while Southeastern and Iroquois desired to keep their respective furnaces in operation without being obliged to purchase large quantities of high grade ore at war prices. This resulted in three identical contracts, each for six months, between Miami and Southeastern covering the entire period of eighteen months, from January 1, 1918, to July 1, 1919.

These contracts are most carefully drawn. The one exhibited here covers fourteen pages of the record and embraces many details which in our view of the issues involved need not be specified. In substance, it was agreed by Southeastern to operate its Goshen furnace in the manufacture of spiegeleisen, ferro-manganese, ferro-silicon, or pig iron, for the account of Miami, from ore, coke and limestone to be furnished by Miami in sufficient quantities to keep Southeastern's furnace in continuous operation. This ore, coke and limestone was to be delivered to Southeastern by Miami, and all the manufactured product so produced by Southeastern for Miami was either to be loaded from the furnace into cars for shipment, or was to be placed in stock by Southeastern for Miami on the premises of Southeastern leased to Miami for that purpose, and ultimately loaded and shipped by Southeastern for account of Miami as and when it should be directed by Miami so to do. Other sections refer to the keeping of accounts, so as to ascertain accurately the amount to be paid to Southeastern as compensation for such manufacture.

The contract also states that Miami had entered into a similar agreement with Iroquois to manufacture similar ores for account of Miami.

After providing in the most minute way for the

keeping of accounts by both in order to determine accurately the net profit accruing to Miami per ton of metals so manufactured and sold, the contract provides that the compensation that Southeastern is to receive from Miami shall be one-third of the net profits received by Miami from the Southeastern operation, to be determined as provided for in the contract, together with one-third of the net profits arising from the Iroquois operation. Statements were to be furnished by Miami of the operation of the Iroquois furnace, including a statement of its net profits, and settlements were required to be made on the first day of each month.

The capital required for this operation was thus provided: Southeastern and Iroquois each loaned Miami $400,000.00, to bear interest at six per cent per annum, and Miami was itself to provide $400,000.00 of capital, making a total of $1,200,000.00. If any additional funds were required, Miami was to supply them. These loans were to be paid sixty days after the termination of the agreements, and were to be repaid by Miami on the final settlement, and if from the combined operations a loss should result, one-third of that loss was to be charged against Southeastern.

There was also a provision that if, after a final settlement, any taxes should be assessed against Miami on account of the operation, Southeastern should pay to Miami one-third thereof; by which provision we understand that if after it had paid to Southeastern one-third of the net profits from the two operations, it subsequently appeared that there were additional items for taxes which should have been also deducted in ascertaining these profits, then Southeastern, to the extent of one-third of such taxes, would have received more than it was entitled to. It was the amount of

this excess that it was required to repay to Miami by this clause. The books and papers of each party, so far as they related to the subject matter of the contract, were to be open to the inspection and examination of the other party at all reasonable times. Settlements of differences were to be made by arbitration. Improvements or additions to the Goshen furnace during the operation, whether paid for by Miami or Southeastern, were to be the sole property of Southeastern; Miami was prohibited from selling a greater tonnage than could be produced at the furnace; and the contract was to be binding upon and inure to the benefit of the respective parties and their successors.

The manufactured products were all shipped in the name of Miami Metals Company, except twelve shipments which were shipped in the name of Miami Metals Company by the Southeastern Iron Corporation.

Under section 8 of the tax bill, as amended by the act of March 6, 1918 (Acts 1918, page 171), it is provided that the assets of persons, firms and corporations employed in a trade or business, not otherwise taxed, shall be classified and taxed as capital, and defines the term *capital* as used in the act. Among other things, capital is defined to include "inventory of stock on hand, which shall include all raw materials for use of the business, whether at the place of business, in storage, or elsewhere in the State."

The principal office of Southeastern being in the city of Richmond, its tax returns were required to be filed there, but section 8 of the tax bill, as amended, provided that stock on hand, raw materials, in storage, or elsewhere, shall be taxed in the county in which they are physically located. Therefore, the inventory of stock on hand of the Southeastern located at its furnace

in Rockbridge county was taxable in Rockbridge county.

Southeastern filed its tax returns in Richmond for the years involved, 1919 and 1920, as required, and copies were transmitted to the proper officials of the county of Rockbridge. It reported for taxation the amount of its own stock on hand for both years, made a mistake in the return for 1920, of which error the authorities were advised as soon as it was discovered and proper adjustment of this was made in the final order in the case. So that, upon its own stock on hand, so assessed as capital, exclusive of the ore and manufactured products covered by this contract (owned by Miami), Southeastern has paid the taxes required by law.

Hon. Wm. M. McNutt, examiner of records for the judicial circuit in which Rockbridge county is located, knew that there was a substantial amount of manganese ore and other products manufactured therefrom at the furnace of Southeastern on February 1, 1919, and believing that it belonged to Southeastern and should therefore be taxed as its capital, questioned the correctness of Southeastern's return of inventory of the value of $57,644.00 for the year 1919, which is the first year here involved. This appears from his letter of December 12, 1919, to the Virginia attorneys for Southeastern, and from that letter it is apparent that he had been previously told that this property did not belong to Southeastern, so he then and there asked to be advised to whom it did actually belong. As to this he was definitely advised by letter of March 24, 1920, that this material was the property of Miami. At this date there was on hand at the Goshen furnace of Southeastern sufficient property so claimed by Miami to have satisfied any taxes which might have been levied

against it, and so the trial court found. This fact sufficiently appears because in May, 1920, that material was still being shipped by Southeastern for Miami, and in the latter part of 1920, there was some of such manganese still on hand, which was sold by consent of Miami when the entire furnace property of Southeastern was sold.

At some time thereafter, during the year 1920, Mr. Norman W. Burgess was appointed examiner of records to succeed Mr. McNutt, and long after the sale of the furnace property of Southeastern had been made, and when the material was no longer in its possession, Mr. Burgess, on December 13, 1920, reported and assessed against Southeastern, for the year 1919, as omitted capital of Southeastern, $1,114,485.00, and on November 24, 1920, he also assessed as alleged omitted capital of Southeastern for the year 1920, $91,385.00, these amounts being the examiner's estimated value of the manganese and spiegeleisen located at the Goshen furnace, which had not theretofore been assessed. It is these assessments from which the trial court has relieved Southeastern.

As to these facts there is no controversy, though there is a wide difference of opinion between the respective attorneys as to the conclusions to be drawn therefrom.

For the Commonwealth and the county, it is claimed:

[1, 2] 1. That Miami and Southeastern were and should be held to be one and the same in the eyes of the law; that there was such a community of interest in the property that an assessment against either or both corporations would be proper; "that the property thus manufactured by Southeastern Iron Corporation can be assessed against the Southeastern Iron Corporation; for by disregarding the corporate fiction, we will find

that the Southeastern and the Miami corporations are in reality the same parties, and that, therefore, it is proper to tax the Southeastern for property which the defendants in error contend is owned by the Miami corporation."

2. That the corporations were partners. "That even if the court refuses to accept the doctrine of disregarding the corporate fiction in order to prevent a fraud on this Commonwealth, nevertheless, there is in law a partnership between the Miami, Iroquois and Southeastern, so that in any event it is proper to tax the entire property against one of the partners, in this case the Southeastern."

3. That personal property can be taxed against the party in possession, even though such party does not hold the legal title; and "that even if the court will not recognize a partnership, the Southeastern must have been holding the property in trust for the Miami, and under our Virginia statute the property is taxable in the hands of a trustee."

Of course, there can be no basis for either or all of these contentions other than the facts which the record discloses—the facts which we have recited. While most if not all of the propositions of law which are urged upon us in the voluminous briefs in support of these several contentions are soundly based, the cases in which they have been applied rest upon facts which are far different from the facts which here appear. In this case the foundation is far too slight to sustain the superstructure. It must not be overlooked that the question before the court does not relate to the taxable obligations of Miami, but only to the obligations of Southeastern, and Miami is not before the court. The assessment from which Southeastern has been relieved is an assessment as upon its own capital, and the rate

of taxation upon capital used in business differs from the rate of taxation upon tangible personal property.

We are asked to disregard the separate corporate entity of these corporations, but this would be also to disregard the evidence. That there are instances when courts are justified in so doing is undoubtedly true, but it cannot be arbitrarily done, and it must have its basis in some substantial reason. The cases in which the courts have enforced this rule are either when the corporate entity is used to conceal a fraud, or when a corporation is so organized and controlled as to make it a mere instrumentality of another corporation.

The rule is thus expressed *In Re Watertown Paper Co.*, 169 Fed. 256, 94 C. C. A. 532: "Unless, therefore, it can be shown that some exception to the general rule of separate corporate existence and liability applies in this case, it must follow that the claim of the pulp company should have been allowed. The only exceptions to that rule possibly applicable here are: (1) The legal fiction of distinct corporate existence will be disregarded when necessary to prevent fraud. (2) It may also be disregarded in a case where a corporation is so organized and controlled, and its affairs are so conducted as to make it merely an instrumentality or adjunct of another corporation."

In *Atchison, etc. R. Co.* v. *Weeks* (D. C.), 248 Fed. 978, this is said, which illustrates the rule: "It is true that a large majority and possibly all the stock of the Rio Grande Company was owned by the Atchison Company, but this fact does not even tend to show that the latter owned or controlled the property of the former or gave it the right to control its business. The property of a corporation is owned by the corporate entity, and not by the owner or owners of its stock. This is true whether the stock is owned by two or

Com. of Va. *v*. South. Iron Corp., 142 Va. 107. 119

Opinion.

more persons or only one, or whether it is owned by a natural person, or by a corporation engaged in the same business. Cook on Corporations, section 709, and authorities therein cited; *Peterson* v. *Chicago, Rock Island & Pacific Railway Company*, 205 U. S. 364, 27 Sup. Ct. 513, 51 L. Ed. 841; *Pullman Palace Car Co.* v. *Missouri Pacific Company*, 115 U. S. 587, 6 Sup. Ct. 194, 29 L. Ed. 499; *Conley* v. *Mathieson Alkali Works*, 190 U. S. 406, 25 Sup. Ct. 728, 47 L. Ed. 1113.

"The fact that the two corporations had the same president and had common agents and employees to a certain extent does not alter the case as the evidence showed they were paid in proportion to the business done for each company."

These cases are also pertinent: *Richmond, etc., Company* v. *Richmond, etc., Company*, 68 Fed. 105, 108, 15 C. C. A. 289, 34 L. R. A. 625; *New York Trust Co.* v. *Carpenter*, 250 Fed. 668, 672, *et seq.*, 163 C. C. A. 14; *Martin* v. *Development Co. of America*, 240 Fed. 42, 45-6, 153 C. C. A. 78; *United States* v. *Strang*, 254 U. S. 491, 493, 41 S. Ct. 165, 65 L. Ed. 368; *Robertson* v. *Garvan* (D. C.), 270 Fed. 643, 649.

A recurrence to the facts of this case shows, as we think conclusively, that the rule relied on to support the assessment cannot be applied here. There is no suggestion of fraud in the testimony. The contracts were for the purpose of carrying out a fair business arrangement between the three corporations, each apparently contracting for its own benefit. There was no secrecy about it. There is nothing to indicate that the definite information which the taxing authorities had in ample time for the protection of the revenues of the State and the county, could not have been supplemented by complete knowledge of every detail of these contracts.

While the principle relied upon is sound, it is so clearly unsupported by the testimony that we do not deem it necessary to say more about it.

[3] It is said also, however, that the agreement shows a partnership. If, however, it was a partnership, the property should not have been assessed as capital of the Southeastern, for the statute (Code, section 2307, amended by Acts Extra Session 1923, page 120), provides that if the property belong to a company or firm, it shall be listed by and taxed to the company or firm.; and in *Commonwealth* v. *Schmelz*, 114 Va. 364, 76 S. E. 905, it is held that a partnership is, for the purposes of taxation, treated as an entity; and it is there said: "The partnership and not the individual members of the partnership are considered as the owners of the partnership property. Its property is to be taxed to the 'firm'—that is, to the partnership and not to the individual members of the firm."

Of course, the claim that this contract should be construed to be a partnership contract, is based upon the provision in the contract relating to profits of the joint adventure.

[4, 5] We do not think any good purpose would be served by undertaking to follow the learned counsel in their elaborate discussion of this question, for it has been well said that "an accurately inclusive and exclusive definition of partnership seems to have eluded the capacity of courts to express." That it is now settled in this country that the sharing of profits and losses is not a conclusive test of partnership can be easily shown from the text-writers, the precedents, and the statutes.

It is said by Mechem in his Elements of Partnership, at page 36: "If there is to be no co-ownership of the business, and one is to receive his share of the profits

in some other capacity than as a principal proprietor, as for example, if he is to receive it as compensation for his services, there is no partnership." So it is also stated in 20 R. C. L. page 829, section 34.

[6] That in order to charge parties as partners, it is necessary that they have a community of interest in and control over the partnership property and business is recognized by this court in *Jackson* v. *Haynie's Adm'r*, 106 Va. 365, 56 S. E. 148, where this is said: "The same principle that leads to the general rule mentioned leads directly to the other conclusion that a mere payment, or promise to pay, out of the profits a sum of money as a specific proportion of the profits does not necessarily constitute the payee a partner, and gives him no interest in the profits and no right to the profits, but only a personal claim for such share of the profits, after they are ascertained and may be divided. If a party has no interest whatsoever in the capital stock, and as between himself and the other party has no rights as a partner, or no mutuality of powers and duties, but is simply employed as an agent and is to receive a proportion of the profits as a compensation for his labor and services, he will not be deemed a partner from that fact alone. Story on Partnership, section 30, *et seq.;* Parsons on Partnership, page 72, *et seq.* It is clear from the authorities that if the parties merely occupy the relation of principal and agent, or employer and employee, no partnership can be predicated upon the fact that such agent or employee receives a share of the profits as compensation for his services or other benefits conferred. This proposition is illustrated by numerous decisions of the courts."

These cases also illustrate the true rule: *Turner* v. *Bissell*, 14 Pick. (Mass.) 192, 193-4-5; *Loomis* v. *Mar-*

*shall,* 12 Conn. 69, 30 Am. Dec. 596; *Michener* v. *Fransham,* 33 Mont. 108, 81 Pac. 953; *Bradley* v. *Ely,* 24 Ind. App. 2, 56 N. E. 44, 79 Am. St. Rep. 251; *Nofsinger* v. *Goldman,* 122 Cal. 609, 55 Pac. 425; *Estabrook* v. *Woods,* 192 Mass. 499, 78 N. E. 538; *Ellis* v. *Brand,* 176 Mo. App. 383, 158 S. W. 705, 708; *Simmons* v. *Shaft,* 91 Kan. 553, 138 Pac. 614.

As examples of trade agreements, which will be construed to be partnerships, there are two cases which are all that we deem it necessary to cite.

[8] In *Commercial Bank* v. *Miller,* 96 Va. 357, 31 S. E. 812, the facts were these: The contracting parties contributed the necessary funds to buy tobacco, which tobacco when purchased they jointly owned. There was a community of interest in the capital employed in the business. The Lynchburg parties bought the tobacco and the Bristol, England, parties sold the tobacco, and they shared in the profits as profits. Here, on the contrary, while the Southeastern loaned money to Miami, Miami was required to return it with interest, so that in legal effect Miami owned this capital; and here, instead of a joint ownership either of the ore or of the manufactured product, the contract in express terms shows that Southeastern had no ownership in either and only received a proportion of the profits which Miami made out of the adventure as compensation for the manufacture. The distinction is quite clear.

So also in the case of *Village of Westby* v. *Bekkedal,* 172 Wis. 114, 178 N. W. 451. There it was held that there was a coownership or community of interest in the tobacco bought by one party with their combined capital and sold by the other for their joint account.

Waiving the question as to whether these corporations could enter into a copartnership (no such power

is shown), we hold under the facts in this case, under the principle stated, that there was no community of interest or ownership either of the capital employed, the ore, the manufactured product, or the profits, and that the only right which Southeastern had was the right to have its compensation measured by the profits.

[9-11] Then, as to the contention that Southeastern was a trustee for Miami, we think it only necessary to say that the statute authorizing the taxing of such property to trustees refers to technical trustees. The section relied upon (Code, section 2307) provides: "If the property is held in trust for the benefit of another, it shall be listed by and taxed to the trustee in the county of his residence." The obvious answer to this contention is, that there has been no assessment against the Southeastern as trustee, but only against Southeastern on its capital alleged to have been employed in its business and omitted from taxation. If these materials could be assessed against Southeastern as trustee, it would appear that they could only be assessed as tangible personal property, and such property carries a rate of taxation different from that imposed on capital employed in business. Then it is perfectly clear that a bailee is not a technical trustee, and this is a correct statement from Dobie's Bailments and Carriers, pages 2 and 3: "Not a few distinguished writers (including Sir William Jones, Story and Kent), in their definitions, refer to a bailment as the delivery of a thing 'in trust.' This terminology is somewhat confusing, however, for in a technical trust the trustee has the legal title to the goods held in trust. In a bailment, as we have just seen, the bailee has merely possession, but not title or ownership."

In *Chapman* v. *Forsyth & Limerick*, 2 How. 202, 11 L. Ed. 236, the United States Supreme Court held that

a factor is not a fiduciary or trustee within the meaning of the bankrupt law, and that in referring to the defalcations of trustees and other fiduciaries that act did not include cases of implied but only of special trusts, and that it refers to technical trusts and not to those which the law implies from the contract. So here, the statute relied on refers to technical trusts and not those implied from the contract.

[12] We do not think it necessary to prolong this opinion by following the learned counsel in their elaborate discussion and reference to the authorities for and against these contentions, because under our view of the case the assessment of this tangible property as omitted capital of Southeastern Iron Corporation cannot be sustained upon any ground, and the court was without jurisdiction to consider any such claim as might have been asserted against Miami Metals Company as its owner, because that corporation was not before the court.

The order is plainly right.

*Affirmed.*