## ·Cowan *et al. v.* Hamilton Nat. Bank.*

### (*Knoxville*, September Term, 1940.)

Opinion filed January 13, 1941.

---

*Certiorari denied, 313 U. S. ——, 85 L. ed. ——, 61 S. Ct. 1116.

96

Joel H. Anderson, of Knoxville, for complainants.

Donaldson, Montgomery & Baugh, of Knoxville, for defendant.

Mr. Justice Chambliss delivered the opinion of the Court.

This bill was filed by trustees under a plan for the reorganization of East Tennessee National Bank, to recover judgment on a certain note, in the sum of $28,000, dated March 10, 1933, and maturing January 10th, 1940, without interest, executed by S. V. Carter, as trustee for the estate of Hal S. Harris, and seeking the sale of certain securities pledged as collateral to this note, which is on the usual comprehensive bank form, with provisions for additional collateral on demand, and containing special provisions incident to the particular and unusual obligation it expresses. Incidentally, an injunction was asked

restraining prosecution by defendant bank, successor
trustee to Carter, of an action at law in detinue, brought
to recover from the complainants the aforesaid pledged
securities. The complainants confessed judgment in the
Circuit Court and the injunction thereupon issued. The
cause was heard on a stipulation of facts. The Chancellor sustained the bill and gave complainants a decree for
the note in the sum of $31,818.56 and ordered sale of the
collateral securities. The bank trustee has appealed.

Harris died in 1927, leaving a will devising practically
all of his estate, estimated at some $75,000, to the East
Tennessee Savings Bank in trust for his wife, Nina
Harris, for life, with power in her of disposition by will.
Among these assets was a block of 280 shares, of the
aggregate par value of $28,000, of the capital stock of
East Tennessee National Bank, which had a total capital
stock of $2,000,000. The Savings Bank qualified and
acted until August, 1932, when it resigned and was succeeded as trustee for the Harris estate by S. V. Carter,
who continued as such until his death, in January, 1935,
whereupon the defendant, Hamilton National Bank, succeeded to this trust.

In January, 1933, the East Tennessee National Bank
failed and a Federal receiver took charge. He discovered
it to be hopelessly insolvent and made a 100 per cent
assessment on the stockholders, under the double liability
provision. Meanwhile, interested parties undertook a
reorganization of the bank and worked out a plan which
called for a reduction of the capital stock to $1,000,000,
and the issuance to old stockholders of new stock in this
ratio, a concession by depositors, reducing their claims
to 70 per cent, payable on prescribed terms, etc., and,
in order to insure the ultimate payment to depositors of
this percentage, the plan provided for the execution of

promissory notes by the stockholders, in the face value, in each case, of the stock held by them, dated March 10th, 1933, and payable January 10th, 1940, this to afford time for collection and application of the assets of the East Tennessee National Bank to the depositors' claims. It was further provided that these notes were to be secured by collateral, or otherwise, pledged by the various makers, and by assignment to the trustees of the new bank stock issued to each. The plan could become effective only when signed by the proportion of depositors and stockholders required by the Federal "Bank Conservation Act" of March 9th, 1933, 12 U. S. C. A., section 201 et seq., passed to meet just such emergencies, the requirement as to stockholders being two-thirds of the stock outstanding, in this case the sum of $1,333,333 of the $2,000,000 of stock outstanding.

The plan was submitted to the Comptroller, who approved it on April 16th, with some modifications of the original draft, not material to note. Finally, after many months, on December 21st, 1933, the required proportion of signatures having been obtained, the Comptroller declared the reopening plan effective, and revoked the assessment against all stockholders, whether they had become parties to the reorganization plan or not, refunding to all such nonsigning and participating stockholders such sums as had been paid by them on account of said assessments. Thus all stockholders who withheld cooperative obligation awaiting the necessity for them to act escaped all liability. Holders of more than $200,000 of this stock thus avoided this liability.

The hopes of those who put over this plan were not realized, with the result that when the notes executed to the trustees by the stockholders of the old bank matured on January 10th, 1940, it was found necessary

to proceed to collect in full these notes and appropriate the bank stock, in order to meet the demands of the depositors secured thereby, who had received up to that time but 15 per cent of their deposits.

At this point the Hamilton National Bank, successor trustee for the Harris estate, being advised that the execution of the note of $28,000 by Mr. Carter, as the then trustee of the Harris estate, and his pledge of an equivalent amount of the securities of the estate, was not authorized, either by the terms of the trust created by the will of the testator, or by any court order, and was not binding, repudiated this attempted obligation and, after demand upon the trustees for a release and return of the pledged securities, brought the action before mentioned in detinue, in the Circuit Court, which action was enjoined, as aforesaid, and the contest was converted into its present form in the Chancery Court.

Summarizing the contentions of the parties, for the trustees under the reopening plan it is argued that Carter, as trustee for the Harris estate, was empowered by the broad terms of the will of Harris to execute this note and pledge the securities of the estate for its payment, without application to, or the approving decree of any Court; that in the situation then presented, involving liability for assessment of 100 per cent on the stock of the estate, the proposed plan afforded a reasonable promise of protecting and profitable results, and was such as would commend itself to the best judgment of a prudent and reasonable man; and that Carter acted in good faith and in the exercise of this prudence and judgment. Reliance is had on the fact that Carter himself, holding 300 shares of this stock, followed this course on his own behalf; that others in large number did likewise; and, also, that Mrs. Nina Harris, the widow and bene-

ficiary of the Harris trust, herself signed a paper addressed to Mr. Carter giving her approval. Expressions in the opinion of this Court in *Young* v. *Phillips*, 170 Tenn., 169, 93 S. W. (2d), 634, 636, are quoted from and relied on to the effect that, when "the utmost good faith" appears, whether or not "prudence and good judgment" have been exercised by one handling trust funds (in that case executors) must be tested "in the light of the conditions at the time presented," and "not from the illumined viewpoint of subsequent events."

On the other hand, on behalf of the Harris trust estate and the widow and others to whom it will pass after her death, it is contended that the will of Mr. Harris, neither by express terms nor implication, conferred any such power on the originally appointed trustee, East Tennessee Savings Bank; that if it could be so construed, Carter, as successor of the bank, received no such power; that prudence in the exercise of his responsibility to these beneficiaries of this spendthrift trust, as well as a legal obligation, demanded of this trustee that he submit to the Court an issue not provided for by the testator and so fraught with peril to his beneficiary; that Mr. Carter was fettered by his personal interests in the success of this reorganization scheme and was thus disqualified, being not only a large stockholder of the failed bank, but a director and its salaried executive head, so that he would be the incidental recipient of large benefits from the putting over of the plan, in which these beneficiaries of the Harris trust, for which he undertook to act, could not share; that, since the obligation he was called upon to assume for his trust was one for the benefit of the banking corporation of which he was a director and executive officer, he was thus dealing with trust funds for his own benefit, which the law will not permit; that a conflict

thus arose and that no man can serve two masters, certainly not his own interest where a trust is involved.

The questions presented are not wholly free from difficulty. It becomes necessary to construe the will of Mr. Harris in the light of its attendant circumstances, and review in further detail the history of the connection of Mr. Carter with this trust he assumed thereunder, particularly with reference to his assumption of authority to execute the obligation in issue.

Mr. Harris had held this stock in the East Tennessee National Bank for some years before his death in 1927. The East Tennessee Savings Bank was a subsidiary of the National Bank, its stock being held by the stockholddders of the National Bank in equal proportions to their National Bank holdings, and its directors and officers being identical. Mr. Carter had been the president of both. Mr. Harris had been a director. This situation doubtless led to the selection by Mr. Harris of the Savings Bank as trustee of his estate, having all confidence that the welfare and protection of his wife would be thus insured throughout her life, not only from the wiles of others, but from her own lack of experience in financial affairs. We here quote the pertinent paragraphs of this will:

"2. I give, devise and bequeath to my beloved wife, Nina Harris, all the rest, residue and remainder of the estate and property, real, personal and mixed, of every kind and character, and wherever situate, of which I may die seized and possessed, with full power and right to dispose of the same by last will and testament; but I hereby put in trust in the East Tennessee Savings Bank, of Knoxville, Tennessee, as Trustee, for the sole benefit of my wife, all of said property for and during the full period of her natural life, with full power in said Bank as such Trustee to possess, manage and control all

the same, paying over to her at regular intervals such parts or all of the net income therefrom as she may desire and request to be turned over to her, she to be free to handle and dispose of such parts or all of said net income as may be so turned over to her during her natural life in such manner as she may see fit, but any part of said net income, not so turned over to her, to become and be a part of the corpus of the property in the hands of the Trustee for disposition by her by last will and testament.

. . .

''In the handling of said property so placed in trust, the Trustee is given full power to buy, sell, exchange and invest in properties and securities the same as the absolute owner might do, during the period of the Trusteeship; but caution, prudence and conservatism is enjoined upon the Trustee, and safe and sound securities shall at all times be chosen for acquisition, even though yielding a lower rate of income, than other yielding a higher rate of income but of questionable safety and soundness.

. . .''

The concluding paragraph appointed the Savings Bank executor and trustee without bond.

By the fifth assignment of error, appellant challenges the failure of the Chancellor to decree ''that the attempted execution of the Reopening Agreement and of the alleged promissory note on which recovery was allowed, and the pledge of the trust assets as collateral thereto, were done by Carter, as Trustee, in violation of the provisions of the trust under which said Trustee was purporting to act and contrary to the law, because execution of the Reopening Agreement and of the note and pledge of the collateral were clearly beyond the powers of Carter, Trustee, to do, the will only authorizing the buying and selling of properties and securities in a conservative

manner for purposes of reinvestment and not for entering into such speculative agreements and obligations."

██ It is clear that no power is expressly conferred by this instrument on the trustee to execute such an obligation as is before us, which pledges a large proportion of the trust estate in drastic terms, and which also involved subscription for other and new stock carrying a double liability in the sum of $14,000 in the reorganized bank. Apparently, no such emergency was thought of by the testator as was presented to the trustee by the failure of the bank and the accrual of this double liability. Indeed, it may fairly be conceived that the testator would have contemplated that this trustee chosen by him, and its officers, including Mr. Carter, would at all times be aware of the internal affairs of this bank and have most · intimate knowledge of its financial condition and would take timely steps to dispose of this liability loaded asset and otherwise invest the proceeds, and thus protect this trust estate against this· day of disaster. Disinterested consideration of the best interests of this trust would have prompted such action. At any rate, we think it obvious that the instrument does not cover this unlooked for emergency. Now it is for just this sort of unforeseen, uncontemplated and unprepared, or provided for, contingency that the Courts are available for instruction and direction. Giving the provisions of the will vesting in the trustee "the handling of the property so placed in trust," with "full power to buy, sell, exchange and invest in properties and securities the same as the absolute owner might do," the most liberal construction, we find authority only to make and exchange investments from which a return might be expected to provide the income for the widow. And this interpretation is strengthened by the clause immediately following, "but caution, pru-

dence and conservatism is enjoined upon the Trustee, and safe and sound securities shall at all times be chosen for acquisition, even though yielding a lower rate of income than others yielding a higher rate of income, but of questionable safety and soundness.'' It will be observed that this estate was free from debt, and cases dealing with the administration of estates when creditors' demand were to be met, and incidental obligations would have to be incurred, are not in point. No reason appears why the general rule should not apply, thus well stated in language which fits the facts of the instant case in 26 R. C. L., page 1303:

''A trustee having power to invest the trust property according to his best judgment, and to pay over the income from time to time to the beneficiaries, and to change any investment at discretion, has no authority to pledge any part of the trust property as security for the payment of a promissory note made by him as trustee, although the money received goes into the trust fund, and is expended for purposes for which the income could rightfully be appropriated.''

And, see Perry on Trusts and Trustees, Volume 2, Section 768, p. 1315; Annotation in 92 A. L. R. 902, 903; Scott on Trusts and Trustees, Volume 2, Section 191, p. 1042, and cases cited in these text books.

We consider further, in this connection, the argued urgency upon this trustee to act when and as he did as a justification of his course. Counsel for the trustees apparently proceed upon the supposition that, upon the question of whether or not Mr. Carter would execute for his trust this reopening plan and the note for $28,000 and pledge the trust collateral to secure it, he had presented for immediate adoption but one of two alternatives, either to pay the assessment of $28,000 which had been

declared by the Comptroller and suffer this loss, or to put his trust in on the Plan and incur the incidental obligations. And it is insisted that in this situation, in the light of the conditions then present (*Young* v. *Phillips, supra*), the trustee acted, not only in good faith, but with reasonable judgment and prudence.

Now we are strongly impressed that he had then open to him two other alternatives, in the adoption of either one of which he would have been in the exercise of far greater prudence and better judgment; and we are further persuaded that, but for the quite apparent fact that his interest in the accomplishment of this plan of reorganization was so great that his judgment as to what was best for his trust was affected thereby, he would have adopted one of them. In the first place, the courts of equity are available for just such contingencies. Here was a situation that, of course, had not been foreseen by the testator, and for that reason not provided for in the will. No express power had been conferred, and none clearly by implication, upon this trustee to incur this unusual obligation. It is in just such cases as this that the trustee, conceiving his trust to be imperiled, and being without conferred power to act, must go to the Court for relief. So may be brought into play a principle which this Court has adopted and applied in our cases of *Bennett* v. *Nashville Trust Co.*, 127 Tenn., 126, 153 S. W., 840, 46 L. R. A. (N. S.) 43, 43 Ann. Cas., 1914A, 1045; *Weakley* v. *Barrow*, 137 Tenn., 224, 192 S. W., 927; *King College* v. *Anderson*, 148 Tenn., 328, 255 S. W., 374, and others. As said in the course of the opinion in a leading case, *Curtiss* v. *Brown*, 29 Ill., 201, "Exigencies often arise not contemplated by the party creating the trust, and which, had they been anticipated, would undoubtedly have been provided for, where the aid of the court of

chancery must be invoked to grant relief imperatively required; and in such cases the court must, as far as may be, occupy the place of the party creating the trust, and do with the fund what he would have dictated had he anticipated the emergency.'' But such relief must be by the Court. It would set a dangerous precedent to permit any testamentary trustee thus to exceed his granted powers, as his individual judgment, however good, and however honestly exercised, might dictate.

█ The suggestion is made that Mr. Carter did not take this course because of the delay incident, but this is in no sense an adequate reply. It would have taken but a brief time, and it is quite significant that, while this plan was submitted to the Comptroller in April, it was not finally accepted and closed until late in December. It is, of course, utterly unreasonable to say that in this long period, while this matter was being kept open and, doubtless, much considered and discussed, with arguments *pro* and *con* being offered there was no opportunity to take this course which the law contemplates.

█ And the second alternative is supported by somewhat these same facts, that is, this trustee, even if it be conceded that it reasonably appeared to be to the best interest of his trust that this plan should be perfected, certainly was under no compulsion to sign up and thus obligate his trust as early as May 12th, when the matter remained open for acceptance until December 22nd. It will be borne in mind that under the terms of the Act it was only necessary to have two-thirds of this two million dollars of stock enter into and agree to become parties to the reopening plan. (It is true that in the course of his letter in April the deputy comptroller mentions $1,800,000 as the amount of stock to be subscribed, but this is not required by the Act, is unexplained and was

quite apparently disregarded, because there never was that amount subscribed.) The fact, obvious now and which should have been appreciated then, is that, if this trustee had merely postponed signing up for his trust, he would have saved for the trust the entire $28,000, since it is stipulated that none of the holders of nearly $250,000 of this stock, who failed or refused to sign up, were required to pay, or lost, one dollar on account of this assessment. In this connection, it may be noted that in the passage of the Act of Congress of March, 1933, provision was made for just such a situation, in that only two-thirds of the stockholders were required to give their assent to a reorganization plan, thus leaving leeway so that infants and non-residents and stock held in trust without powers adequate to act, etc., might be left out and the reorganization proceeded with by those who were *sui juris* and competent and qualified to act for themselves. All of the facts and circumstances would seem to have impressed on Mr. Carter the unlikelihood that this plan of reorganization would ultimately be beneficial, even if adopted, and the desirability of withholding the assent of his trust until the last moment.

While no attack is made upon the administration of this trust by the original trustee Savings Bank, or its successor, Mr. Carter, except in this one particular, it is difficult to avoid the inquiry, so plainly suggested by this record, why the trustee continued to carry this double indemnity stock asset throughout so dangerous and disastrous a period, particularly to banks, as began in 1929 and extended to the spring of 1933, when all the banks in this country were closed by executive order. Certainly, prudent men everywhere were conscious throughout this period of great potential danger of the continued holding of such an asset, always considered of doubtful quality

for a trust estate. And, in addition to this, it is hardly possible to understand why the officers of this Savings Bank, including Mr. Carter, who were also the officers of the National Bank, were not in a position to know at least something of the weakness of this particular institution, which was during this period tottering to its fall.

So, in speaking of "the light of the conditions at the time presented," in which this trustee acted, it must be borne in mind that, if anyone should then have known of the rotten condition of this bank's assets, and was in a position to appreciate the improbability that depositors could ever realize 70¢ on the dollar, it was Mr. Carter, who had grown up and lived intimately with this institution since 1887.

Yet another phase of this situation should be mentioned, which strengthens the view heretofore expressed of (1) the duty of this trustee to have invoked disinterested court direction, and (2) his failure to use due caution. It was peculiarly the duty of this trustee to submit this matter to the court before obligating his trust for this double liability, because the legal liability was questionable under all the facts, first, as to whether it could be enforced at all, and, second, whether it was a liability of the trust, or of the trustee himself. While it is true that the Act of Congress which fixed double liability on national bank stockholders extended this liability to trust estates holding such stock, the enforcement of such liability has been successfully resisted under circumstances at least suggestive of those here presented. In 7 Am. Jur., p. 75, it is said that, "If the investment in bank stock was unauthorized, the trust estate has been held not liable for the constitutional or statutory liability of stockholders to the bank's creditors." The text cites the annotation in 91 A. L. R., 260, where cases will be

found discussing the question and supporting the principle, although distinguishable on their facts from the instant case. *Bagnell* v. *Ives,* C. C., 184 F., 466; *Golden* v. *Cervenka,* 278 Ill., 409, 116 N. E., 273; *Williams* v. *Cobb,* 2 Cir., 219 F., 663; *Mobley* v. *Phinizy,* 42 Ga. App., 33, 155 S. E., 73, and others. Sometimes the trustee has been held liable for a breach of trust in making such irregular, improvident, and unauthorized investments as bank stocks carrying double liability. Certainly nothing in the will of this testator expressly authorized investment of the funds of the estate in this unsafe asset. Quite commonly, prudent managers of estates reject stocks as a class, and particularly stocks carrying double liability. It is true that this investment had been made by the testator and was included in the assets devised, but the will did not direct the retention of this or any other investment, and did not prescribe or limit the discretion of the trustee in this regard, save only to impress in the strongest terms that safety should be the first consideration. Now, as has been seen, not only was this an asset of a character involving risk, but both the savings bank and Carter were chargeable with notice long before the bank failed of its precarious financial condition. No court would have failed to hold that under such conditions it was an improper, unsafe, and therefore unauthorized investment for this estate to hold. Was it not the plain duty of this trustee to challenge, rather than so promptly concede, liability of his trust for this assessment, and certainly to submit to the court the issue presented by this emergency, so charged with peril to his trust, rather than assume to act with such unnecessary haste? We are forced to the opinion that in the exercise of that prudence which his intimate knowledge of this Bank's condition should have insured for the pro-

tection of his trust, Mr. Carter should have at least refused to obligate his trust until the last available moment, when demand for such action appeared to be imperative to save the plan from failure.

We come next to consider the apparent violation of another and fundamental tenet of trust administration, the requirement of absolute freedom from personal beneficial interest on the part of the trustee. The twelfth assignment of error is as follows:

"The Chancellor erred in failing and refusing to hold that S. V. Carter was as a matter of law not in a position to act impartially and judiciously in regard to the execution of the Reopening Agreement and the signing of the note and the pledging of the collateral, because he was at the time a large stockholder in the East Tennessee National Bank and was Chairman of the Board of Directors of said Bank, and was up to the closing thereof active in the management of the affairs of said Bank."

Is it possible to say, however free from a wrongful purpose, or a conscious bias, we concede Mr. Carter to have been, and however reasonable and prudent, under the then conditions the course he followed appeared, that he occupied that wholly disinterested position which the law exacts of a trustee? Of course, "nothing in the law of fiduciary trusts is better settled than that the Trustee shall not be allowed to advantage himself in dealing with the trust," 26 R. C. L., p. 1325. And the rule quite properly goes further. The trustee may not act for his trust whenever he has an adverse personal interest which will be served thereby. When the trustee is acting for himself, he is disqualified to act for his trust. When self-serving interest enters, trustee power passes out.

No reason appears why this officer of the Savings Bank took over this trust in his individual capacity, in August,

1932, at a time when it is common history that the country was passing through a devastating financial depression. For some undisclosed reason, without any suggestion of advantage to this estate, in this crisis, Mr. Carter chose, for it must be assumed that it was of his choosing, to take into his individual control these large liquid assets, on execution of a ten thousand dollar bond. Within a little more than four months later the East Tennessee National Bank failed. Mr. Carter had been actively connected with these banks for many years, much of the time as president of both, and, in January, 1933, he was chairman of the board. It is true that we find no evidence in the record of his active participation in the reorganization and it is stipulated that he was not responsible for the preparation of this reopening plan, doubtless the work of legal and bank accounting experts, but it cannot be doubted that this was a matter of not only great financial consideration to him as a stockholder and director and salaried officer, but appealing strongly to his pride and sense of responsibility to the sixteen thousand depositors of nearly ten million dollars in this institution to which his name had contributed its standing.

He was confronted with loss, not only of his personally held stock and an assessment thereon, but, of far more importance to him, the wide spread community calamity which the crash of this great financial institution threatened, and the condemnation by the public of those, who, along with himself, had been its responsible managers. He was also apprehensive, no doubt, of an aftermath of litigation, including suits, as elsewhere prosecuted under like conditions, to enforce against himself and associates directorship liability in large sums. Thus Mr. Carter doubtless saw, as did his companions, in an agreement in some form for at least temporary reor-

ganization, the only prospect of relief. These considerations must have far outweighed any interest which he had in common with the trust for which he undertook to act along with himself. In other words, we think it inescapable that Mr. Carter had a benefit to himself to attain, not shared in by his trust, which operated as at least a subconscious inducement. Now this violates the "universal rule that a trustee will not be allowed to deal with a trust estate for his own benefit." 26 R. C. L., 1322. Or, as expressed by the Georgia Supreme Court, a trustee "owes an undivided duty to the beneficiary, and must not place himself in a position where his personal interest will conflict with the interest of the beneficiary." *Clark* v. *Clark*, 167 Ga., 1, 144 S. E., 787, 789. A trustee whose individual interest "may conflict with his duties as trustee" is subject to removal as such, and is disqualified to act for his trust estate. See 65 C. J., p. 619, and notes, among them this quotation, which well expresses this sound and general rule, from the New York case of *Pyle* v. *Pyle,* 137 App. Div., 568, 122 N. Y. S., 256, 259, affirmed in 199 N. Y., 538, 92 N. E., 1099:

"It is a fundamental rule relating to the acts of a testamentary trustee, that he must not only act for the benefit of the trust estate, but also in such a way as not to gain any advantage, directly or indirectly, except such as the law specifically gives him, for himself. He owes an undivided duty to his beneficiary, and he must not, under any circumstances, place himself in a position whereby his personal interest will come in conflict with the ininterest of his cestui que trust. . . . The purpose sought to be secured by this rule of law is to require a trustee to assume a position where his every act is above suspicion and the trust estate, and it alone, can receive, not only his best services, but his unbiased and unin-

fluenced judgment. When he has acted otherwise, or when he has placed himself in such a position that his personal interest has or may come in conflict with his interest as trustee, then, so far as I have been able to discover, the court never hesitates to remove him. Under such circumstances, the court does not stop to inquire whether the transactions complained of were fair or unfair. It stops the inquiry when the relation is disclosed.''

While by no means on all fours on its facts with the case at bar, the opinion of the Wisconsin Supreme Court in *In re Filardo*, reported in 221 Wis., 589, 267 N. W., 312, 105 A. L. R., p. 438, and the annotations following, contain excellent statements of the rules governing the conduct of testamentary trustees, with special reference to the voidable nature of all transactions involving the trust estate had by a trustee with himself or in any degree for his own advantage. In both the reported case and in the annotations this quotation is approved from *Ottawa Banking & Trust Co.* v. *Crookston Bank et al.*, 185 Minn., 22, 239 N. W., 666: ''When a trustee trades the trust property to himself or to his advantage, his cestui [or a successor trustee] may avoid or affirm it as he chooses without showing damage though no actual fraud is practiced . . . the law will not . . . permit him to submit himself to the temptation of acting in his own interest rather than with fidelity to his trust.'' In this Minnesota case the trustee of the estate was at the same time an officer of a bank with which he undertook to deal for his trust. This the Court held he could not bindingly do, whether in good faith or not, and regardless of the loss or gain resulting.

Our own decisions are in accord. Indeed, nowhere do we find a stronger statement than that of our own great equity jurist, COOPER, J., in the course of his learned

opinion in *Cannon* v. *Apperson,* 82 Tenn. (14 Lea), 553, at page 579, where he wrote that ''No principle is better settled, or founded upon a sounder basis of legal ethics and positive law, than the principle which declares that whoever undertakes to act for another in any matter shall not, in the same matter, act for himself, and this without regard to the fact whether he has or has not made a profit by the act. Equity disallows the measure without reference to advantages or unfairness, and treats it as a breach of trust, charging the trustee accordingly: *Perkins* v. *McGavock,* 4 Tenn. (3 Hayw.), 265. The authorities are uniform to this effect.'' The language of Judge Cooper was taken almost *verbatim* from the opinion of Whyte, J., in the *McGavock Case,* which is only one of our decisions announcing the principle. Chancellor Gibson lays down, as a maxim, the rule that ''No man bound to act for another in any matter can, as to that matter, act for himself.'' Suits in Chancery, par. 46.

Certainly, a court of equity will not lend itself to the enforcement of an obligation against a trust estate which the trustee acting was thus disqualified to create. In the instant case, as has before appeared, Mr. Carter was a leading officer of the bank which was proposed to be reorganized under this plan. It was his duty as such, and greatly to his personal advantage, to bring about this reorganization. In entering into this heavy obligation he was acting in a dual capacity, on the one hand as trustee for this estate and on the other as an officer of this bank. This being so, he was disqualified to act, even if it should be conceded that he had been vested by the general terms of the will of the testator with power to so bind this trust estate.

It will be recalled that a paper signed by the chief beneficiary of this trust, in the nature of a spendthrift

trust, Mrs. Nina Harris, is offered by the trustee to support the action of Carter, by estoppel, or otherwise, and it appears that the learned Chancellor gives this great weight, but we are unable to do so. If any one thing is made plain on the face of this will it is that this husband sought to protect his widow from the effects of any voluntary, or induced, control or disposition by which she might in any manner or degree affect this trust estate. Any theory that this trust estate could be affected by her action is directly in the teeth of the clearly indicated wishes of the testator. It was not within the power of a beneficiary of this spendthrift trust thus to thwart the purpose of the donor; such is the holding of this Court, in principle, in *Vines* v. *Vines*, 143 Tenn., 517, at pages 534 et seq., 226 S. W., 1039.

We deem it unnecessary to prolong this opinion by discussion of other questions presented on the able briefs of counsel. On the grounds indicated, the decree of the Chancellor must be reversed and judgment entered in favor of the appellant bank trustee for the cancellation of the note and possession of the pledged securities.