KNOX COUNTY *v.* FOURTH & FIRST NAT. BANK *et al.*

(*Nashville,* December Term, 1943.)

Opinion filed October 14, 1944.

ARMISTEAD, WALLER, DAVIS & LANSDEN and ROY H. BEELER, of Nashville, and JOHNSON & JOHNSON, of Knoxville, for Knox County, complainant.

NORVELL & MINICK, BASS, BERRY & SIMS, and SEAY, STOCKELL & EDWARDS, all of Nashville, for the Bank, defendant.

MR. CHIEF JUSTICE GREEN delivered the opinion of the Court.

As it comes before us this case presents the question of the liability of the Fourth & First National Bank of Nashville (hereafter called the Bank) to Knox County (hereafter called the County) for the loss of the greater part of the balance of the County's deposit in the Bank of Tennessee. The net balance, after crediting the proceeds of certain collateral and a small dividend from

Caldwell & Company, amounted to over half million dollars. The Bank of Tennessee was an institution now *defunct*, which was also located in Nashville. The deposit as indicated was secured by collateral placed in the Fourth & First National Bank, in the acceptance and handling of which collateral it is alleged that such Bank was guilty of conduct amounting to a breach of trust. The chancellor dismissed the bill as to the Bank. The Court of Appeals reversed the chancellor's decree and rendered a decree in favor of the County for the amount of its net balance with interest. Petitions for *certiorari* were filed by both parties, both petitions granted, and the case has been elaborately argued and briefed in this Court.

The facts more in detail are these.

Caldwell & Company was a corporation located at Nashville, which described itself as investment bankers. It dealt in bonds and stocks and did a considerable business of promoting various enterprises and underwriting securities. Its business was of large proportions and the concern enjoyed a good financial reputation for much of its existence, but was plainly in difficulties in 1930. It was not, however, regarded as insolvent by the business community until the latter part of that year.

Rogers Caldwell owned all the stock of Caldwell & Company and Caldwell & Company owned all the stock of the Bank of Tennessee. We may treat the two corporations as an entity as the Bank insists we should.

The Fourth & First National Bank was a large financial institution and enjoyed a great reputation for strength and conservatism. James E. Caldwell, the father of Rogers Caldwell, was president and, evidently from the record, the dominating influence in this bank.

Under Chapters 226, 228 and 254 of the Private Acts of 1929, three issues of 4½% bonds, in the amount of $950,-000, were authorized to be issued by Knox County. The enabling Acts required that the bonds should not be sold at less than par. Money was not so easy at that time and a sale of these bonds at face value was not readily to be obtained.

In this situation Caldwell & Company on August 27, 1929, wrote to the Knox County officials offering to have the bonds printed, to perform other services in connection with the issue, and to bid par and accrued interest for the bonds on these conditions:

"In consideration of the fore-going service it is understood that you will leave the funds on deposit with us, or banks of our selection, without interest to be drawn upon only as needed to pay for work as the same progresses, and that you will endeavor to have the city agree to spend these funds after having spent their part. It is further understood that said bonds will be advertised for sale as soon as legally possible and that said bonds will be awarded on date of advertised sale and delivered immediately thereafter.

"For security of said funds we agree to give you Surety Bond in amount equal to the funds so deposited with us. It is understood that you will furnish certified transcripts, such certificates, etc., as said Attorney may require, all free of cost to us."

A sale of the bonds was had on September 16, 1929, and Caldwell & Company made a bid for the same pursuant to its offer above. Its bid was accepted after some further negotiations and upon execution of certain collateral trust agreements. Caldwell & Company designated the Bank of Tennessee as the depositary bank. The trust agreements were all of the same tenor in the form

of letters addressed to the County by the Bank of Tennessee. That one dealing with the $500,000 issue of bonds contained these provisions:

"As collateral security covering deposit made with us this day, in the amount of Five Hundred and Two Thousand, One Hundred Eighty-Seven Dollars and Fifty Cents ($502,187.50), we agree to deposit with the Fourth & First National Bank, Nashville, Tennessee, as Trustee, the following collateral:

"$500,000.00 Knox County, Tennessee 4½% Henley Street Bridge Bonds, dated September 1, 1929.

"26,000.00 Lauderdale County Tennessee 5% Road Bonds, Dated August 1, 1929.

"It is understood and agreed that these funds are to be checked on only as needed to pay when payment is due, the construction of the improvement for which the above mentioned Henley Street Bridge Bonds are issued, as the same progresses, or for any other purpose for which it may be legally spent for which payment is due, all withdrawals to be made on approved vouchers of the proper officials of Knox County, showing said payments to be due and correct.

"It is agreed that we shall have the privilege of withdrawing from the Trustee collateral in equal proportion as vouchers are drawn against this deposit and paid by us, maintaining, however, at all times, collateral having a market value equal to the amount of the deposit. It is also understood that we shall have the privilege of substituting from time to time, State, City, County or other municipal bonds or other securities in which we regularly deal, provided the collateral securities offered for substitution are satisfactory to the Trustee. The Trustee, the Fourth & First National Bank, shall report to the proper official of Knox County, from time to time,

upon his demand, giving a list of collateral held under this trust and in the event at any time, any collateral so held is unsatisfactory to Knox County, Tennessee, the Bank of Tennessee agrees upon demand to substitute other satisfactory collateral.''

This letter was signed by the Bank of Tennessee and to it was appended the following:

''The above trust accepted. We hereby acknowledge receipt of

''$500,000.00 Knox County, Tennessee 4½% Henley Street Bridge Bonds, Dated September 1, 1929.

''26,000.00 Lauderdale County, Tennessee 5% Road Bonds, Dated August 1, 1929.

''Fourth & First National Bank.

''By R. Curell

''Assistant Trust Officer.''

At the same time a surety bond to secure the deposit was executed by Rogers Caldwell and other officers of the Bank of Tennessee. We gather from the record that the sureties on this bond are not now solvent and that the County has little or no chance of realizing anything therefrom.

The bonds were delivered and a pass book issued to Knox County by the Bank of Tennessee showing a deposit in that bank to the credit of the County of $954,156.25.

Most of the Knox County bonds were withdrawn from the hands of the trustee almost immediately and other securities substituted. On September 23, 1929, 750 shares of Insurance Securities Corporation stock were substituted and all the bonds withdrawn by Caldwell & Company. This was done with the approval of the Bank and upon the Bank's certification of its approval the substitution was approved by the Judge and Trustee of Knox County.

Insurance Securities Corporation was a Nashville-owned concern whose assets consisted of stock in the Missouri State Life Insurance Company and some other securities. At the same time of this substitution the stock of Insurance Securities Corporation was owned one-half by Caldwell & Company and one-half by the Fourth & First National Company. The latter company was an affiliate of the Bank, described by one of the Bank's officers as "our trading company." The County does not now find fault with this substitution, it being conceded that the stock in the Insurance Securities Corporation put up in September, 1929, was of adequate value at that time.

No further substitutions of collateral appear until September, 1930, although there was a liquidation of Insurance Securities Corporation in the summer of 1930 and an apportionment of the assets. The County insists that the distribution of that corporation's assets was made without the knowledge of Knox County, greatly to the prejudice of the County and was a fraud on the County's rights. This matter will be referred to later.

Earlier in September, 1930, there were some withdrawals and substitutions of collateral which are assailed by the County but which we do not find it necessary to consider. On September 22, 1930, there was substituted for the collateral then in the hands of the trustee 25,000 shares of stock in the Banco-Kentucky Company and 25,000 shares of stock in Shares in the South. The proposal to make this substitution was contained in a letter from the Bank of Tennessee to the trustee bank in which it was stated that Banco-Kentucky stock was currently selling at $17 per share and that Shares in the South stock had a liquidating value of $31 to $32 a share and that based on these values the collateral was worth $1,-

225,000. At that time the balance to the credit of Knox County in the Bank of Tennessee was $735,531.69, the sum of $218,749.56 having been previously drawn out by the County.

At the foot of the letter just mentioned appeared: "Substitution above mentioned satisfactory. Fourth & First National Bank by R. Curell, V. P. & Trust Officer, Knox County, Tennessee, By S. O. Houston, County Judge, By Frank W. Flenniken, County Trustee."

Early in November, 1930, Caldwell & Company closed its doors and a receiver was appointed for the Bank of Tennessee shortly thereafter. The State had a large deposit in the Bank of Tennessee and the priority of its claim left nothing for the other depositors of that institution. Banco-Kentucky stock turned out to be worthless. The stock of Shares in the South deposited to secure Knox County sold for $7.00 a share, $175,000, and this sum was credited by Knox County, as was a small dividend of $2,314.44 paid by the receivers of Caldwell & Company.

The bill in this case charged a conspiracy among the Bank, Caldwell & Company, James E. Caldwell, Rogers Caldwell and others to defraud Knox County and much proof was taken with the apparent purpose of developing this theory. The chancellor and the Court of Appeals, however, both found that the conspiracy charge was not sustained. That being out of the way, we think the primary question to be determined herein is whether the Bank exercised such care in the acceptance as collateral on September 22, 1930, of the Banco-Kentucky stock and Shares in the South stock as the law required under the obligation undertaken by the Bank in the trust agreements.

■ It was provided that collateral offered in substitution should "at all times" have "a market value equal to the amount of deposit" in the Bank of Tennessee. The right to substitute securities of the classes mentioned was reserved by the Bank of Tennessee "provided the collateral securities offered for substitution are satisfactory to the Trustee." In entering upon the administration of this trust, therefore, the Bank contracted that it would accept no collateral in substitution which it was not satisfied would "at all times have a market value equal to the amount of the deposit." By this obligation the Bank did not become a guarantor of the collateral it might accept in substitution, but we think it did become obligated in this particular to the exercise at least of such care and diligence as is required of a trustee clothed with power to invest in stocks and bonds. Indeed a trustee in a case like the one before us is not entitled to so much latitude as a trustee for investment. The latter must place his funds so as to secure the best income for the beneficiary consistent with safety. The Bank here had to look to safety only.

It is urged by counsel that the Bank is not to be regarded as a trustee, or a technical trustee herein, but merely as a bailee. Some decisions are cited to support this view, namely, *Commonwealth* v. *Southeastern Iron Corp.*, 142 Va., 107, 128 S. E., 528; *DeMott* v. *National Bank of New Jersey*, 118 N. J. Eq., 396, 179 A., 470; *Lawrence* v. *First Nat. Bank of Kalamazoo*, 266 Mich., 199, 253 N. W., 267. The Virginia decision is a tax case and merely holds that the concern involved was not a trustee under the Virginia tax statute. The New Jersey and Michigan cases turn largely on evidence showing consent of beneficiaries to acquisition of particular properties by the trustees. Insofar as these decisions sustain the

Bank's argument that it is not to be regarded as a technical trustee, the decisions rest on the theory that a technical trust requires that title be vested in the trustee.

That theory is of no avail to the Bank here. Curell, the trust officer of the Bank, testified that he exacted a power of attorney whenever stock was deposited with him as collateral security. Under the Uniform Stock Transfer Act, section 4094 *et seq.*, of the Code, title vests in the holder of certificates of stock when those certificates are indorsed or accompanied by a power of attorney authorizing their transfer.

In Scott on Trusts, section 5, and in Bogert on Trusts and Trustees, Vol. 1, sec. 11, it is pointed out that the principal distinction between a trust and a bailment is that a bailee has no title and cannot convey the property to an innocent purchaser for value while a trustee does have legal title and can convey to an innocent purchaser for value. By the express provision of the statute, the Bank holding these certificates of stock accompanied by power of attorney did take title and could transfer to such a purchaser.

We see little difference in the functions to be performed by a trustee for investment and such a trustee as the Bank in this case. To each is confided the duty .of exchanging property for property. The same diligence and care respecting the exchange is to be expected in each instance.

The basis of the trust relation is confidence in the trustee. The testimony of the Knox County judge shows that he trusted absolutely the Bank's judgment as to the value of the collateral securities it would take in substitution. The definition of a technical trust last adopted by this Court is:

"An obligation arising out of a confidence reposed in a person to whom the legal title of property is conveyed, that he will faithfully apply the property according to the wishes of the creator of the trust." *Jackson* v. *Dodds,* 154 Tenn., 602, 610, 290 S. W., 402, 405.

In *Muldoon* v. *Trewhitt,* 38 S. W., 109, 112, the Court of Chancery Appeals has collected many definitions of a trust in which confidence in the trustee rather than title in the trustee is emphasized as the distinctive feature of the trust relation.

█ The Chancellor and the Court of Appeals both held the Bank to be a trustee and we think they were right.

█ The chancellor applied the familiar rule that the trustee was required to act in good faith, with due diligence, and with such care and skill as a person of ordinary prudence would exercise in dealing with his own property. Applying this rule to the facts of the case the chancellor exonerated the Bank. In so doing we think the chancellor was influenced by the case of *Gibson County* v. *Fourth & First Nat. Bank,* 20 Tenn. App., 168, 96 S. W. (2d), 184, to which he several times refers in his opinion. That case was similar to the one before us, although the facts therein do not appear to have been so fully developed as they are here. A petition for writ of *certiorari* was denied in the Gibson County case by this Court necessarily without investigation of the facts. There was a concurrent finding of the chancellor and of the Court of Appeals in favor of the Bank beyond which we could not go.

In the present case and the proof now before us, we do not think, in the acceptance of the Banco-Kentucky stock and Shares in the South stock as collateral adequate at all times to secure the County's deposit, the Bank exer-

582

cised the diligence and care that a man of ordinary prudence would exercise in dealing with his own property, and a somewhat higher duty rested upon it. A man of prudence, as pointed out by the cases, for the sake of increasing his estate, may take chances with his own in making investments. In handling trust property, however, he is more restricted. Professor Scott, in his work on Trusts, at section 227.3 *et seq.*, discusses this matter at some length, collecting authorities.

 In the acceptance of substituted collateral on September 22, 1930, it seems to us that the Bank was negligent in at least three particulars:

First. The record does not show any such investigation either of the Banco-Kentucky stock or of the Shares in the -South stock as a prudent trustee should have made.

Speaking of trustees for investment, Scott says:

"Before making an investment it is the duty of the trustee to use reasonable care in making an investigation as to the safety of the investment and as to the amount of income which will probably be received." Scott on Trusts, Sec. 227.1.

And again, "It is not enough that the trustee in investing trust funds uses care and skill. A man of business in investing his own funds, or even a speculator, may use a high degree of care and skill in attempting to increase the value of his estate. In so doing, however, he may take risks which a trustee is not justified in taking. . . . In other words a trustee must be not merely careful and skilful but cautious." Id., Sec. 227.3.

Even "An authority to trustees to invest in such 'securities as may in their judgment be best' does not relieve them of the duty of investigating as to the safety of the particular investment into which they put the funds." Perry on Trusts (7 Ed.), Sec. 460.

As to the Banco-Kentucky stock, Curell testified that there was a meeting of officers of defendant Bank in the summer of 1930, which was attended by President James E. Caldwell, Vice Presidents Webb and Williamson and himself. At this meeting Curell said the collateral value to be given Banco-Kentucky stock was discussed and fixed at $12 a share. To Curell was assigned the duty of keeping up with the market quotations on this stock. What investigation the other Bank officers present had made of the stock or were to make Curell did not undertake to say. Neither do they. Webb denied that he attended any such meeting. Neither James E. Caldwell nor Williamson testified.

Curell said that he knew that the Banco-Kentucky Company was a corporation owning stock in a number of banks. That he understood its principal asset was stock in the National Bank of Kentucky and the Louisville Trust Company, both of which institutions he regarded highly. Curell knew that Banco-Kentucky Company as well as National Bank of Kentucky was headed by a Mr. Brown who had a high reputation as a financier and business man, being a director in several large corporations.

Curell further testified that he knew that Banco-Kentucky stock was accepted as collateral by other banks over the country, that the Fourth & First National Bank held some of this stock to secure loans from other banks to Caldwell & Company and from itself. He said that he kept up with the market quotations of Banco-Kentucky stock on the Chicago Exchange and the Louisville Exchange. The stock was not listed on the New York Exchange. On cross-examination it appeared that most of the out of town banks lending on Banco-Kentucky stock to Caldwell & Company had other collateral. Other proof shows one of these banks was charging 10% interest. The

American National Bank at Nashville appears to have made a loan on Banco-Kentucky stock but with other collateral, valuing the stock at $12 a share. Commerce Union Bank of Nashville seems to have made a loan on that stock, giving it a collateral value of $8 a share, and the Tennessee Hermitage Bank at Nashville made a loan on the stock giving it a collateral value of $3.50 a share. We may observe that these bank loans of their own funds were business risks which the banks had a right to take.

On August 28, 1930, according to the proof herein, defendant Bank held 333,645 shares of Banco-Kentucky stock as collateral, 206,085 to secure debts to itself, and 127,560 shares as trustee. After the Bank accepted the Banco-Kentucky stock to secure Knox County, the aggregate number of these shares it then held under collateral trusts was 152,560. It does not appear that any other bank accepted Banco-Kentucky stock as collateral in any such amount as did defendant Bank.

Proof in this case shows that trades in Banco-Kentucky stock on the Louisville Exchange and on the Chicago Exchange as well as over the counter sales were light during July, August and September, 1930. Few sales were made and in small lots. No prudent man could have supposed that the price brought by the few shares of this stock traded in during July, August and September, 1930, was a fair index of the value of 25,000 shares or of 127,500 shares which the Bank already held as trustee on September 22, 1930, to say nothing of the 206,085 shares of this stock which the Bank held as collateral on its own account.

■ "To hold that the value of a large block of corporate stock, for which there is no market, must be determined at the same value per share as that for which a few shares were sold, for which there was a market,

without taking into consideration other factors and circumstances which plainly affects the value is supported by neither logic nor reason. It is a matter of common knowledge that the value of any product or commodity, whether it be wheat, hogs or otherwise, is affected by the law of supply and demand, and that where the former far exceeds the latter, it has a depressing effect upon value. Reference to the daily markets of the country support this statement. No doubt the value of corporate stock is similarly affected.'' *Commmissioner of Internal Revenue* v. *Schattuck* (7 Cir.), 97 F. (2d), 790, 792.

Apart from Curell's knowledge of the general reputation of two of the banks in the Banco-Kentucky chain, his knowledge of the reputation of Mr. Brown, the head of Banco-Kentucky, and the fact that some other banks were taking Banco-Kentucky shares as collateral—generally part collateral—so far as the record shows, the only knowledge that the Bank had of the worth of this stock was such knowledge as Curell obtained from the quotations of the prices at which small lots sold. If any other investigation of these securities was made it is not disclosed.

As heretofore stated, Vice President Webb denied that he was on any investigating committee to appraise this stock. President Caldwell and Vice President Williamson did not testify. It is said that his age and infirmities prevented Mr. James E. Caldwell from taking the witness stand. That is perhaps the Bank's misfortune. The failure to call Mr. Williamson to testify is not explained. He was shown to be in Nashville and available.

When a trust is established the burden is on the trustee to make full disclosures of all transactions attacked and to show that he performed his duties with reasonable skill. *Knowlton* v. *Fourth-Atlantic Nat. Bank,*

271 Mass., 343, 171 N. E., 721; *Franklin* v. *Mortgage Guarantee, etc., Co.,* 57 F. (2d), 834. To the same effect is *Talbot* v. *Auto, etc., Underwriters,* 163 Tenn., 256, 43 S. W. (2d), 220.

There is proof in the record offered by defendant tending to show the value of Banco-Kentucky stock in September, 1930, exceeded the value at which the Bank took it as collateral or the value at which it was quoted. Such of the witnesses as were cross-examined as to the effect upon the market of an offering of 25,000 shares conceded that the value would be depressed unless some interest were trying to acquire control of the concern.

But if it be admitted that Banco-Kentucky stock was accepted by the Bank at a fair collateral value, and that any investigation open to the Bank would have disclosed nothing to the contrary, such value of 25,000 shares at $12 would only amount to $300,000 and the balance of Knox County in the Bank of Tennessee when this stock was put up was $735,531.69. This brings us to the consideration of the value of the 25,000 shares of Shares in the South and the investigation made of the same.

So far as the proof shows there was no investigation whatever of the value of Shares in the South stock at the time it was taken by the Bank as collateral for the Knox County deposit. Curell testified that Shares in the South was an investment trust, its assets consisting of stock in other corporations. He said that shortly after the organization of the company, about two years prior to September, 1930, he was furnished with a statement of its business and solicited to buy some of the stock at $40 a share. This he did not do, but he had knowledge of some sales of the stock at about that time at that price. He did not know of any recent sales of the stock when he accepted it as collateral but he did know that Caldwell

& Company was buying in the stock at from $30 to $32 a share with the idea of liquidating the corporation. This is the whole of his testimony. President Caldwell did not testify as to the value of this stock nor did Vice President Williamson who Curell said had immediate supervision of the accounts of Caldwell & Company and the Bank of Tennessee.

If Mr. Currell had investigated Shares in the South in September, 1930, he would have found, as the record shows, that it had only about $80,000 of listed stocks. That the other stocks in its portfolio consisted of shares in corporate enterprises that were sponsored by Caldwell & Company. Among its assets was a deposit of $600,000 in the Bank of Tennessee whose obligation to Knox County the stock was taken to secure.

Curell would further have found, according to the proof, that many of the purchases by Caldwell & Company of the stock of Shares in the South were consummated by exchanging for these shares shares in other corporations which Caldwell & Company was sponsoring. The relations between defendant Bank and Caldwell & Company and the Bank of Tennessee were undoubtedly such that the Bank could have obtained all information it desired from these sources. Had it obtained knowledge of the facts just above detailed, it is to be doubted that the Bank could have in good faith fixed a collateral value of $20 a share, or $500,000, on the Shares in the South stock put up with it to secure Knox County. At any rate, it was the duty of the Bank to make an investigation of these shares, what they would probably bring on the market, and as we have seen there was no investigation.

Second. Authoritative writers discussing trusts for investment say that it is the duty of a trustee to diversify his investments—to distribute the risk of loss. Scott on

Trusts, sec. 228; 3 Bogert on Trusts and Trustees, sec. 612.

It seems to us that a trustee undertaking the duty of accepting collateral securities to secure several municipal trusts, such as this one, of which Knox County was the beneficiary, should likewise be required to distribute the risk of loss to his *cestuis que trustent* and not hazard their interests on a single security to such an extent as was done here. As we have previously noted, the Bank held as collateral on other municipal trusts 93,360 shares of Banco-Kentucky stock when it accepted 25,000 additional shares on the Knox County trust. Upon default of the Bank of Tennessee there would thus have been forced on the market 118,360 shares of Banco-Kentucky stock. In addition the Bank held as collateral for other banks 34,200 shares and about 200,000 shares for its own benefit. The Bank might have kept and liquidated at its leisure the shares of Banco-Kentucky stock that it held to secure debts to itself, but it could not have kept the stock held as collateral for others off the market and such an offering of so much of this stock would without doubt have resulted in loss to all those for whose security it was deposited.

Third. In our opinion, however, the greatest dereliction of duty of which the Bank was guilty was in taking no thought of the effect of the possible failure of Caldwell & Company on this collateral accepted on September 22, 1930, to secure the deposit of Knox County. Curell frankly states that he did not consider this possibility at all. Yet he knew, as he says, that Caldwell & Company was hard up at times but he thought it would in the future surmount any difficulties as it had done in the past. At the same time he knew that the security market was dull and financial conditions were not favorable.

The creditor takes a surety or security, in familiar language, "to answer for the debt, default or miscarriage of another." If the value of the security depends wholly on the solvency of the debtor, it is no security at all. If such value depends partially on the solvency of the debtor it is but partial security. The acceptance of such security compares with the traditional effort of the man who tried to lift himself by his own boot straps. A partner, for instance, is not regarded as an acceptable surety for the debt of a firm of which he is a member.

In May, 1930, the Banco-Kentucky Company and Caldwell & Company made a deal by which Banco-Kentucky acquired a one-half interest in Caldwell & Company and Caldwell & Company acquired either 800,000 or 900,000 shares of Banco-Kentucky stock. The stock of Banco-Kentucky consisted of 2,500,000 shares, so that Caldwell & Company acquired about a third of it and about a third of the value of Banco-Kentucky stock was based on a half interest in Caldwell & Company.

This deal was widely advertised in Nashville and in Louisville and over the country. The officers of defendant Bank knew or could have known all about its details.

The glaring fault in the argument that the Bank acted with prudence in accepting this Banco-Kentucky stock as collateral herein is that in so doing the Bank had a right to assume that Caldwell & Company would remain solvent. This idea ignores the very purpose for which security is taken. That purpose is to provide against the insolvency of the debtor and a collateral security should be appraised with such contingency in view.

A trustee acting with prudence must have foreseen the effect the failure of Caldwell & Company would have on the value of Banco-Kentucky shares. One-third of

that value was based on one-half interest in Caldwell & Company and, beyond this, the connection between the two concerns had been so publicized; no reasonable man could have doubted that the failure of either would have resulted in disaster to the other. As a matter of fact the failure of Banco-Kentucky followed that of Caldwell & Company very shortly, as might have been easily anticipated.

What we have just said about Banco-Kentucky stock applies to stock in Shares in the South. Investigation would have shown the Bank that the assets of that corporation in September, 1930, consisted almost wholly of shares of stock in corporations sponsored by Caldwell & Company and of a $600,000 deposit in the Bank of Tennessee. It was readily to be foreseen that the failure of Caldwell & Company or the Bank of Tennessee would be destructive of the value of stock in Shares in the South. As a matter of fact, after the failure of Caldwell & Company and the Bank of Tennessee, stock in Shares in the South sold for $7 a share instead of $20 a share at which it was received as collateral. It is said that the market declined between September and the time when this stock was sold a few months later, but there was no such decline in the market generally during this period as a decline of 75% which these shares suffered.

The record shows that Randall Curell, the trust officer of defendant Bank, is a gentleman of high character and that he was an honest and careful banker and man of business. When the Bank of Tennessee proposed to make the substitution of collateral on September 22, 1930—the 25,000 shares of Banco-Kentucky stock and 25,000 shares of Shares in the South stock—Curell referred the matter to President James E. Caldwell. He was informed that Mr. Caldwell approved the substitution and he (Curell)

thereupon indorsed his approval as appeared on the written proposition when it was submitted to Knox County. Before completing the substitution Curell saw Mr. Caldwell in person and ascertained directly that the latter approved it provided one of the Bank's attorneys approved and the Knox County officials approved. The particular attorney Mr. Leftwich, was dead at the time proof was taken, but it is to be gathered that he was only consulted about the authority of the Knox County officials to bind the County, not as to the value of the securities. As heretofore appears, after Curell approved the substitution, the Knox County judge and trustee approved it and we shall later comment on the effect of their approval.

We gravely doubt that Mr. Curell would have approved this substitution of Banco-Kentucky stock and Shares in the South stock without the aproval of President Caldwell. At any rate, he did not do so. It is true that Curell says in response to suggestive questions that the substitution was satisfactory to him but a spirit of loyalty to his chief doubtless entered into this answer. It is not easy to conclude that so careful a banker as Mr. Curell could have been satisfied that these shares of stock would "at all times" be of a value equal to the amount of the Knox County deposit. At least he would have reached no such conclusion if he had made further investigation and taken into consideration the effect of the failure of Caldwell & Company upon the value of these securities. We repeat that Mr. James E. Caldwell is shown by clear implication from the proof to have been the dominating figure in this bank and there is no testimony from him.

It is said that Mr. James E. Caldwell knew little or nothing of the affairs of Caldwell & Company and, owing to the personal relationship, required the dealings of that

concern with the Bank to be transacted with other officers. If so ill informed as to his son's business, he could not have known much about Banco-Kentucky, certainly little about Shares in the South, an enterprise whose assets consisted almost wholly of stock in corporations Caldwell & Company was sponsoring.

We do not think any officer of defendant Bank would have turned down collateral which President Caldwell passed as satisfactory and if he approved the securities accepted on September 22, 1930, without knowledge of their worth, the Bank must take the consequences. Without his approval, under the circumstances disclosed, the substitution would not have been made.

Referring again to the language of the trust agreement, the Bank of Tennessee undertook to provide that substituted securities should be ''at all times'' of a market value equal to the amount of the deposit. ''At all times'' is a phrase practically equivalent to ''at all events'' and it is hard to see how defendant Bank could have been satisfied that the collateral value it had placed on these securities would hold in the event of the failure of Caldwell & Company.

It is urged by the Bank that the approval of this substitution of September 22, 1930, by the County Judge and County Trustee precludes the County from making any question upon its propriety. The County denies the authority of these officials to bind it in this respect. We need not go into this.

The Bank invokes the general rule applicable to investments by trustees that a competent beneficiary who accepts or approves of an investment with full knowledge cannot thereafter complain with respect to it. The authorities, however, all state an exception to that rule in very much the same language and announce that the

rule is not binding when the beneficiary is led into an approval or acceptance of the investment by improper conduct of the trustee. 3 Bogert on Trusts and Trustees, sec. 689; Scott on Trusts, Sec. 216.3; Restatement of Trusts, Sec. 216(1) (c).

We think it has been clearly shown that the trustee Bank was here guilty of improper conduct. It certified to the County that the substituted securities were satisfactory. This implied that the trustee had carefully investigated the securities and taken into consideration such matters as were likely to affect their value as collateral for an obligation of the Bank of Tennessee. In reality the trustee Bank had made no adequate investigation and had failed to take into consideration vital factors to which it should have looked in prudently fixing these collateral values. The chief officer of the Bank, whom we regard as responsible for the final substitution, did not undertake to justify it and the Bank's proof tends to show he had little knowledge of the values involved.

The County had a right to rely on the Bank's representation that the securities were proper collateral for the purpose for which they were accepted. The County had a right to rest its acceptance on the representation by the Bank. No investigation of the securities was made by the County so far as the proof shows and the Bank is not entitled to base a defense on an acceptance that in turn was based on the Bank's representation.

The County argues with force that the Bank throughout the administration of this trust acted with its own interest and that of Caldwell & Company in mind rather than the safety of the Knox County deposit. It is not necessary, however, to prolong the opinion by a consideration of the circumstances upon which this argument rests.

If this case were disposed of by a strict application of the rules applied by courts of equity to a trustee, it would fall under *Cowan* v. *Hamilton Nat. Bank*, 177 Tenn., 94, 146 S. W. (2d), 359, and the Bank held liable because it could be said that it was acting for itself rather than for the beneficiary in fixing the value of the collateral accepted on September 22, 1930. In the testimony of Mr. Curell he states that the Bank derived considerable profit from handling collateral in these trusts. It made a charge of 10c a thousand on the valuation it placed on such collateral. He said that since the Bank valued the collateral in the Knox County trust at a million dollars or more, a profit of about a hundred dollars a month was derived from the administration of that trust. Thus it seems that the interests of the Bank and the County were adverse. The interest of the former being to value the collateral generously, the interest of the latter being to value the collateral strictly. This being so, neither prudence nor good faith would protect the trustee Bank in the valuation which it put upon the collateral.

There is nothing in the agreement with Knox County about compensation of the trustee, nor have we found anything in the record, to indicate that Knox County had any knowledge of such an arrangement. We suppose Caldwell & Company paid the Bank's charges. In some of the trust agreements filed herein Caldwell & Company expressly assumed that expense.

We have referred to a distribution of the assets of Insurance Securities Corporation in the early summer of 1930. It will be recalled that 750 shares of this stock were owned by Caldwell & Company and were deposited as collateral in the Knox County trust in September, 1929. The remaining stock of Insurance Securities Corporation, 750 shares, was owned by the Fourth & First National

Company. Insurance Securities Corporation was liquidated and its assets distributed without any notice to Knox County.

Without going into the details, it is sufficient to say that in the distribution of the assets there was allocated to the shares pledged to the Bank for Knox County a million dollar indebtedness of Caldwell & Company to the corporation. On the other hand there was allocated to the shares owned and pledged to the trustee Bank for itself a million dollars worth of marketable securities.

This liquidation was had under supervision of the officers of the trustee Bank who were in greater part the officers of its "trading company." No doubt this was a breach of trust. The Court of Appeals finds a causal connection between this breach of trust and the acceptance of the collateral taken in the Knox County trust by the Bank on September 22, 1930. Further, that Court was of opinion that having breached the trust by ignoring the rights of Knox County in this distribution of Insurance Securities Corporation's assets and doing this without notice to Knox County that thereafter the Bank became a guarantor of all securities accepted by it as collateral in this trust.

■■ Having reached the conclusion that the Bank should be held liable on other grounds, it is not required that we should further discuss the opinion of the Court of Appeals. We think the disposition of the case by that Court was correct except as to interest and costs. That Court allowed interest at 6% on the claim of Knox County from November 5, 1930, the day Caldwell & Company closed, until the date of its decree. That is now about fourteen years ago and interest at that rate would amount to about as much as the principal. Knox County has only been paying 4½% interest on the bonds it issued

and as a matter of common knowledge no such interest as 6% could have been obtained during the greater part of these fourteen years for such a sum of money as half million dollars. The equities do not call for such an allowance of interest and no statute requires interest in a case like this. The hearing of the cause has been unduly delayed. It is true that deaths of counsel on both sides have been responsible for some of this delay, but at all events the case should have been disposed of finally within three or four years. Innocent stockholders and perhaps creditors of the Bank will be affected by such an allowance of interest. The decree of the Court of Appeals will therefore be modified so as to allow interest at 4½% for four years.

Likewise we think the Bank should not be taxed with all the costs. A tremendous record has been brought up largely at the instance of the County, much of it no doubt in the effort to make out its case of conspiracy which failed. Accordingly one-third of the costs will be taxed to Knox County.

Modified as indicated, the decree of the Court of Appeals is affirmed.